UNITED STATES, Appellee

v.

Frank L. REISTER, First Lieutenant
U.S. Marine Corps, Appellant.

No. 95–0171.
CMR No. 92 2604.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 7, 1995.

Decided Sept. 5, 1996.

*David R. Dowell* (argued); *Lieutenant Commander Eric C. Price,* JAGC, USN, for Appellant.

*Major S.P. Finn,* USMC (argued); *Colonel Charles Wm. Dorman,* USMC and *Commander D.H. Myers,* JAGC, USN (on brief); *Colonel J. Composto,* USMC and *Major Laura L. Scudder,* USMC, for Appellee.

* *See* 41 MJ 213, 229 n. * (1994).

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer members at Cherry Point, North Carolina, convicted appellant, contrary to his pleas, of conspiracy to commit adultery; consensual sodomy; assault with a means likely to inflict grievous bodily harm; adultery (6 specifications); and fraternization, in violation of Articles 81, 125, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 881, 925, 928, and 934, respectively. The members sentenced him to a dismissal, confinement for 7 years, and total forfeitures. The convening authority reduced the confinement to 4 years, with 2 years suspended for 4 years, but approved the remainder of the sentence. The Court of Military Review * affirmed the findings and the approved sentence. 40 MJ 666 (1994).

Our Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING INTO EVIDENCE ITEMS THAT WERE OBTAINED THROUGH AN ILLEGAL SEARCH AND SEIZURE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION.

We hold that the military judge did not abuse his discretion in admitting the evidence.

*FACTUAL BACKGROUND*

Appellant, a Marine officer, met Hospitalman Apprentice N while having his foot X-rayed at the Naval Hospital, Marine Corps Air Station, Cherry Point, North Carolina. N was 19 years old and new to the Navy. She had just completed training and reported for duty as an X-ray technician at Cherry Point, her first duty station, on August 30, 1991.

Appellant came to the hospital to have his foot examined on September 16, 1991. He introduced himself to N as "Frank Reister." N testified that appellant talked to her about her job and told her that "he had a cat

named Spike" and that his father was a radiologist. Appellant had just told N that "he was going on leave and he was thinking about having someone over to watch his apartment while he was on leave and take care of his cat." Appellant then gave N his work telephone number and home number, and asked N to call him. N testified that she knew appellant was an officer because they were both in uniform when he visited the hospital.

N called appellant later in the day, and he invited her to his apartment. She went there at about 9:30 p.m. At the apartment, appellant told N "that he was going to need somebody to watch his house because he had a lot of expensive stuff; and, of course, he didn't want to leave the cat there, so he wanted [her] to take care of the cat and to stay in the apartment because he wanted it to be protected." When asked about any limitations on her use of the apartment, N testified as follows:

> He asked me to stay in his apartment, and, later on, I went to get some belongings and stuff and toiletries so I could stay there and take care of the apartment. He told me that while I was there, I was allowed to have anything out of the refrigerator. He didn't tell me anything about where I could go. He told me that I could have friends over. He was real, you know, real relaxed about the whole thing....

>        \*     \*     \*

> [H]e never told me that I could never go into any section of the apartment. He didn't give me any restrictions. He showed me how to operate his VCR. He showed me how the television worked. He showed me about all of the appliances in the house—in the apartment, and he gave me no restrictions as far as what I could or couldn't do.

At appellant's apartment, they "sat on the couch French-kissing for awhile" and appellant fondled her breasts. N testified that when she started to leave, appellant said, "I have a spare bedroom if you ever need to stay or you ever want to stay over, because it is getting late, you know."

Appellant and N originally agreed that N would sleep in the spare bedroom while appellant was gone, but the room was full of boxes and appeared to have been used as a storage room, making it unusable as a bedroom.

N went to appellant's apartment "two or three" more times. She spent a Saturday afternoon with him, riding his new motorcycle.

On September 22, the day before appellant was scheduled to depart on leave, N called him and he invited her to the apartment for dinner. Appellant told her that he would give her the key and a visitor's pass that evening.

N went to appellant's apartment with her belongings, intending to stay there instead of in the barracks. Because appellant would be gone for 3 weeks, N brought "a lot of clothes," her toiletries, and an iron.

After dinner, N and appellant "started French-kissing like we had before, except this time he was kissing me harder and he was squeezing my breasts...." N testified that when appellant tried to pull up her shirt, she said, "Look, Frank, I don't want to do this.... I am a virgin and I want to wait until I get married to lose it." They then finished cleaning up the kitchen and then engaged in more kissing and fondling. N testified that appellant asked her, "Why don't you come and lay down with me in my bed and just let me hold you."

Appellant showered, lay down on the bed with N, kissed her, performed oral sex on her, and then had intercourse with her. Based on these acts, appellant was charged with rape and forcible sodomy, but he was acquitted of the rape and found guilty only of consensual sodomy.

N testified that after they had intercourse, there was a lot of blood and fluid on the sheets. She said that appellant asked, "How did this happen?" N testified that she was afraid and confused and could not return to the barracks because it was late and she did not have her military identification.

The next morning, N went to work about 6:00 or 6:15. She took the key and visitor's

pass with her. Appellant was still in the apartment when she left.

She returned to the apartment after work on Monday, September 23. By this time appellant had departed. She testified that she looked around the apartment, "trying to get an idea of things." When asked "[w]hat kind of ideas" she was looking for, she testified, "Well, I thought maybe that—I was still trying to say, 'Well, this person is not really that bad; he can't be. It's something that I did wrong or something.' " She noticed that appellant had a Bible and some religious books on a bookshelf in the bedroom. She also noticed a green cloth-covered logbook with a Marine Corps emblem, a Federal Supply Service stock number, and appellant's name written on the cover in military format: "Reister, F.L., USMCR." The logbook was on an open bookshelf containing several books, magazines, videotapes, and assorted clutter.

N testified that she saw the logbook while she was "just looking around." She explained her discovery as follows:

> I saw the logbook, and I knew Lieutenant Reister used to fly. It was just something that really interested me. I thought flying was really neat, and I thought that maybe this was like a flight record book or something, so I opened it up and I was looking through it, and there were, like, entries made from flights. You know, I wasn't thinking anything about it, and then I flipped back to the back and found some things that I didn't expect to be there.

N found a page with the word, "CONQUESTS," at the top. It contained names of women, dates, places, and graphic descriptions of the women's sexual performance.

N testified that she also looked inside a bedside stand and "found a piece of paper with the word 'Zovirax' written on it." The paper was on top of a telephone book in a drawer.

N remembered from her medical training that "Zovirax" sounded "like something that you would use to treat a virus." When she returned to the base, she looked up Zovirax and discovered that it is the brand name for a drug used to treat genital herpes.

N told her roommate what had happened, and her roommate advised her "to go report it, go to somebody that would help me, somebody that will take me to be treated." N and her roommate reported what had happened to Lieutenant Hester, N's superior officer. Lieutenant Hester sent N to the Family Practice Clinic where she was examined. The doctor "wrote out what [N] told them on a piece of paper and they turned it in to [the Naval Investigative Service] NIS."

N was questioned by NIS agents on September 24, 1991. She told the NIS agents that she had been raped and forcibly sodomized. She described her activities with appellant in detail. She also described in detail appellant's apartment, his office, his motorcycle, and his clothing. Regarding the logbook, she said, "Frank had a USMC log book, which was a diary of his sexual encounters. The logbook is on a book shelf on the right side of the bed."

N testified that she declined to sign her statement. She explained her reasons for not signing the statement as follows:

> The reason why I did not sign the statement is because, one, I'm enlisted and he's an officer and I knew that was wrong because it interrupted the structure. I also didn't sign it because I felt like if I didn't sign it, I wouldn't have to come to court. Coming to court is not one of those things that everybody looks forward to doing, especially in a case like this....

At some time after her interview by the NIS and before October 4, N attempted to call appellant and tell him to make other arrangements to watch the apartment and care for his cat. She placed the call from appellant's apartment. She was unsuccessful. Although she no longer slept in the apartment, she retained the key to the apartment and returned several times to retrieve personal property and feed the cat.

On October 4, 1991, N consented in writing to a search of appellant's apartment. She went to appellant's apartment with two NIS agents, as well as Major Gordon, the trial counsel in this case, and her enlisted supervisor, Chief Petty Officer Wilson. N testified

that she asked Major Gordon to accompany her because she felt more comfortable with him than with the NIS agents, whom she did not know. She testified, "I was the one who showed them where the logbook was. I showed them where all of the pictures were on the wall. I showed them the condoms. I showed them everything."

NIS Special Agent (SA) David Sosebee testified that he photographed appellant's apartment on October 4. When asked if he was "collecting evidence," SA Sosebee answered in the negative. He explained: "I was photographing the log book because it was corroboration of what Miss [N] had advised earlier in the day." He testified that the NIS went to appellant's apartment "to see if the items Miss [N] had described in the statement that she had given to [SA] Rick Ervin were there." The NIS agents decided not to remove anything from the apartment until they "could make additional investigative inquiries." They "did not want [appellant] to arrive and find the items missing and have the opportunity to call anyone, from an investigative standpoint, that [they] may need to talk to."

The defense moved to suppress the photographic evidence based on N's lack of authority to consent to a search. The military judge denied the motion. He found that appellant had invited N to live in the apartment, gave her unrestricted access, and authorized her to invite others into the apartment. He found that N discovered the logbook entries and other evidence "premised upon her own curiosity and not at the urging of NIS." The military judge concluded that appellant "had no reasonable expectation of privacy within the apartment between 22 September 1991 and the time he returned from leave because he had provided [N] with a key to his apartment for the purpose of residing there while he was away."

Several women listed in the logbook were contacted and testified against appellant on the charges of adultery and conspiracy to commit adultery. Appellant testified on the merits and admitted having sexual intercourse with the women while he was married

to someone else. The defense theory was that the sexual intercourse occurred under circumstances that were not service-discrediting or prejudicial to good order and discipline.

## DISCUSSION

Appellant argues that (1) N did not have authority to consent to a search of his apartment; (2) even if she had authority at some time, she abandoned her control of the property before consenting to the search; and (3) she was a government agent when she consented to the search. The Government argues that appellant did not have a reasonable expectation of privacy because he had relinquished control of the apartment to N. Alternatively, the Government argues that the search was lawful under the good-faith exception of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)—*see* Mil.R.Evid. 311(b)(3), Manual for Courts-Martial, United States (1995 ed.); and the inevitable-discovery doctrine of *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)—*see* Mil.R.Evid. 311(b)(2).

A military judge's evidentiary ruling is reviewed for abuse of discretion. Findings of fact will not be overturned unless they are clearly erroneous or unsupported by the record. Conclusions of law are reviewed *de novo*. In reviewing a ruling on a motion to suppress, we consider the evidence "in the light most favorable to the" prevailing party. "We will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law." *United States v. Sullivan*, 42 MJ 360, 363 (1995); *United States v. Kitts*, 43 MJ 23, 28 (1995); *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir.1993).

We hold that N had authority to consent to the search. Furthermore, even if her authority did not extend to the contents of the logbook and the Zovirax note in the nightstand, any invasion of appellant's privacy was the product of a private search, not governmental action.

### Actual Authority to Consent

■ A person with "common authority over the premises" may consent to a search. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. White*, 40 MJ 257, 258 (CMA 1994). Similarly, a person who "exercises control over" property "may grant consent to search." Mil.R.Evid. 314(e)(2). The Government has the burden of showing consent by clear and convincing evidence. Mil.R.Evid. 314(e)(5).

■ Opening a closed logbook and reading it constitutes a search, even if the logbook itself is in plain view. *See United States v. Silva*, 714 F.Supp. 693, 696 (SDNY 1989). The pivotal issue in this case was N's "degree of control" over the property. *See* Drafters' Analysis of Mil.R.Evid. 314(e)(2), Manual, *supra* at A22–26; *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *United States v. Mathis*, 16 USCMA 522, 37 CMR 142 (1967). Even if N had authority to permit the NIS agents to enter the apartment, the Government had the burden of showing that she had authority to display the contents of appellant's logbook and the "Zovirax" note to them. *See United States v. Mathis*, 16 USCMA at 524, 37 CMR at 144 (occupant could consent to search of house but not of "any place personal to the accused").

■ The evidence shows that appellant placed no express restrictions on N's access to the apartment. The question remains, however, whether the logbook was in a place that was impliedly off-limits to N. We hold that it was not. The logbook was not in a drawer, chest, lock box, or even a closet. It was displayed openly along with books, magazines, video tapes, and miscellaneous clutter that were available for N's perusal and use. Furthermore, the logbook itself contained no external indicia of privacy. The outside cover and even the formal, military style of appellant's name on the cover suggested to the casual viewer that the book concerned military duties, not personal information. The list of sexual conquests was no more protected by appellant than it would have been if he had listed the information on a piece of note paper and placed it in one of the paperback books on the same bookshelf. *See United States v. Clow*, 26 MJ 176, 187 (CMA 1988) (failure to secure property signifies absence of subjective expectation of privacy).

The military judge found as fact that N had unrestricted access to the apartment and authority to invite others into the apartment, and he concluded as a matter of law that appellant had no reasonable expectation of privacy in the apartment during his absence. Since the military judge's findings of fact are not clearly erroneous and his ruling was not affected by an erroneous view of the law, we hold that he did not abuse his discretion in admitting the evidence.

### Abandonment

■ Appellant asserts that N abandoned her authority over the premises and thereby lost her authority to give valid consent to the search. This assertion is without factual or legal merit.

Factually, the record supports the military judge's rejection of appellant's argument. The record shows that N did not abandon her control over the apartment. To the contrary, she kept the key, continued to feed the cat, and entered several times to retrieve personal property. While she may have intended to relinquish control at some future date, she had not as of October 4, the day of the search.

Legally, appellant's argument is based on incorrect premises of contract law, agency, and property law. We agree with the military judge's conclusion as follows:

The fact that [N] phoned the accused to tell him that she was going to leave the apartment sometime before 4 October is of no consequence. The accused invited her to reside within the apartment for the period of time that he was on leave and had no expectation of privacy for that entire period of time.

In *United States v. Clow*, 26 MJ 176, 183–84 (CMA 1988), we said: "[T]he validity of consent should not hinge on niceties of property law or on legal technicalities." This

statement was based on *United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974), where the Supreme court explained:

. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

(Citations omitted.)

The military judge found that appellant gave N unrestricted access to the apartment. There is no evidence that appellant withdrew or restricted her access at any time. The military judge ruled that appellant had no reasonable expectation of privacy after giving N unrestricted access to his apartment. Since the military judge's findings of fact are supported by the record and his ruling on the motion to suppress was based on a correct understanding of the law, we hold that he did not abuse his discretion in rejecting appellant's abandonment theory.

### Agency

At the outset, we reject appellant's argument that N was a government agent. Defense counsel did not make a specific agency argument at trial, but the military judge addressed it tangentially when he found that N discovered the logbook entries and Zovirax note "premised upon her own curiosity and not at the urging of NIS."

The Supreme Court's analysis in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), applies to this case. In *Coolidge* the defendant's wife had voluntarily retrieved and surrendered his clothing and weapons to the police when they came to the Coolidge home to question her about her husband's whereabouts on the night of a murder. The Supreme Court articulated the test for agency as "whether Mrs. Coolidge, in light of all the circum-

stances of the case, must be regarded as having acted as an 'instrument' or agent of the state when she produced her husband's belongings." 403 U.S. at 487, 91 S.Ct. at 2049. The Supreme Court held that Mrs. Coolidge did not become an agent of the police, notwithstanding her voluntary disclosure and surrender of evidence that incriminated her husband. The Court was persuaded by evidence that Mrs. Coolidge thought the evidence would exonerate her husband.

Addressing Mrs. Coolidge's voluntary assistance to the police, the Supreme Court held that a motive to assist the police does not create an agency. The Court said, "But there is nothing constitutionally suspect in the existence, without more, of these incentives to full disclosure or active cooperation with the police.... [I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." 403 U.S. at 488, 91 S.Ct. at 2049.

■ N regarded herself as a victim, was treated as such by law enforcement authorities, and was found by the military judge to be acting out of "curiosity and not at the urging of NIS." 44 MJ at 413; *see United States v. Portt,* 21 MJ 333, 334 (CMA 1986) (airman who opened locker because was "curious" not government agent). Her desire to assist the NIS because she wanted appellant apprehended and punished did not make her an agent or "instrument" of the NIS. *Coolidge v. New Hampshire, supra.*

### Private Search

Assuming *arguendo* that N did not have authority to display the logbook and "Zovirax" note to the NIS agents, we conclude that any invasion of appellant's privacy was the product of a private search. The exclusionary rules for unlawful searches apply only to searches made by someone "acting in a governmental capacity." *See* Mil.R.Evid. 311(a). Hence, the Fourth Amendment and the exclusionary rules are not implicated by a private search. *See Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048

(1921); *United States v. Sullivan*, 42 MJ at 363–64.

In this case, N's exploration of appellant's apartment was motivated by her own curiosity and her confused feelings about appellant. She had not yet accused him of rape. Once she found the "Zovirax" note and the list of names in the logbook, appellant's privacy already was invaded. Since N had authority to invite others into the apartment, at that point there was no significant constitutional difference between N's bringing the logbook and "Zovirax" note to the NIS, or bringing the NIS to the evidence. "Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information." *United States v. Jacobsen*, 466 U.S. 109, 117, 104 S.Ct. 1652, 1658, 80 L.Ed.2d 85 (1984). *See United States v. Portt*, 21 MJ at 334 (After airman opened locker in private capacity and summoned OSI [Office of Special Investigations] after finding evidence of drug use, "subsequent opening of the locker was simply a continuation of that entry."). Accordingly, we conclude that the exclusionary rules were not triggered by any private invasion of appellant's privacy.

## DECISION

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge COX and Judges SULLIVAN and CRAWFORD concur.

EVERETT, Senior Judge (concurring in the result):

There are several points made in the majority opinion with which I do not agree. Specifically, *if* the entry into the apartment by the agents of the Naval Investigative Service (NIS) was not a consent search, *but see infra*, then I am troubled by the majority's discussion of (1) whether N was an agent of law enforcement officials; and (2) whether this case can be affirmed as a "private search" by N.

N's own rummaging around appellant's apartment surely was a "private search." Accordingly, if she had remembered the women's names in the log book and repeated them to the NIS agents or if she, herself, had taken a picture of the page in the logbook on which the names appeared, there could be no Fourth Amendment complaint by appellant. But that is not what happened. N's private search, alone, did not expose the challenged evidence to anyone except herself, so her private search under the circumstances of this case is not relevant to admissibility of the challenged evidence.

Further, if she had delivered the logbook to authorities on her own initiative, she would not have become a law enforcement agent in the process, *see Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Moreover, it even might be argued that, if she had initiated an invitation to the NIS agents to come with her to appellant's apartment to retrieve the logbook, that would be the functional equivalent of her taking the logbook from the apartment and giving it to the agents. Under that rationale, she would not have been an agent of law enforcement in that scenario, either.

But, again, that is not what happened. Indeed, the court below found as fact that a *prosecutor* to whom N had been referred *"advised* her that she might want to consent to a search of the premises in order that there would be evidence (in the form of pictures of the scene) to support her allegations." 40 MJ 666, 669 (1994) (emphasis added).

Accordingly, I agree with the majority that N was not an agent of law enforcement when she initially foraged around appellant's apartment, so that activity remained purely a private search. However, as I have just pointed out, that private search yielded nothing to anyone but N, so it is not relevant to this appeal; and whether she was a government agent in the subsequent entry into appellant's apartment is irrelevant, since *official* government agents also *were* in that search party.

With these strawmen knocked down, it seems clear to me that this appeal rises or

falls on whether N had actual authority to consent for law enforcement officers to enter appellant's apartment and, then, look through the closed logbook. On the basis of the factfinding below, which I do not find clearly erroneous, I conclude that she did.

From the picture drawn in the opinion of the Court of Military Review, see 40 MJ at 669, it is inescapable that appellant gave N virtually full discretionary power over his entire apartment, even to the point of expressly authorizing invited guests (with the sole caveat of no loud parties). It well may be that appellant did not contemplate specifically that invited guests would include police, see generally United States v. White, 40 MJ 257, 259 (CMA 1994) ("It is one thing to allow a friend or cotenant limited access to a private bedroom without requiring express permission; it is quite another to allow the friend or cotenant to bring third parties, especially the police, into a private bedroom."). But where appellant handed over carte blanche discretion to N, without any meaningful restrictions by way of access to any part of the apartment (including his own bedroom) or, significantly, any of the items of property therein, the discretion was hers to exercise. She did, and appellant must live with the consequences.

Before closing, I want to make brief comment on a couple of tangential issues, not determinative of this appeal. First, it might seem curious that police would rely upon the authority to consent of someone who has just claimed to have been raped by the owner of the apartment. Under such circumstances, one might logically conclude that the victim does not enjoy such power. This would be relevant to an inquiry into *apparent* authority to consent; but where the evidence shows that there was *actual* authority, the question of apparent authority is not reached. See

United States v. Welch, 4 F.3d 761, 764 (9th Cir.1993).

Second, as the majority points out, N tried to telephone appellant before the challenged search in order to eschew any further responsibility for the apartment and the cat and, impliedly, any further rightful access to the apartment, as well. She failed to reach appellant, however. Accordingly, the extensive authority that appellant had given her neither was rescinded by appellant nor denied by her. Thus, it remained intact—at least in the absence of any evidence that N unilaterally abandoned the agreed-upon arrangement. See generally United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974) (proper focus in looking for actual authority is consenting party's "relationship to the premises").

Finally, it is possible under these facts that, if the agents' intrusion contravened the Fourth Amendment, the taint of that violation on the live-witness testimony of the women whose identity was learned from reading the logbook was so attenuated that the testimony nonetheless was admissible. See United States v. Ceccolini, 435 U.S. 268, 274–79, 98 S.Ct. 1054, 1059–62, 55 L.Ed.2d 268 (1978). Under the facts of this case, however, I believe that such an analysis is a much closer call than the issue of N's' actual authority to consent, in light of the factual findings below that underlie the latter analysis. Consequently, I have elected to address the consent issue directly, rather than to assume a Fourth Amendment violation and then inquire into possible attenuation of the taint.

With the foregoing comments, I join the majority in concluding that the military judge properly overruled the defense objection and in affirming the decision below.