**UNITED STATES, Appellant,**

v.

**Travis D. GREENE, Aircraft Electrician's Mate Airman (E–3), Appellee.**

**NMCM 200102232.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Decided 25 March 2002.

Capt Patricio A. Tafoya, USMC, Appellate Government Counsel.

LT Travis J. Owens, JAGC, USNR, Appellate Defense Counsel.

PRICE, Senior Judge:

This case is before us as an interlocutory appeal by the Government, filed pursuant to Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862 and RULE FOR COURTS-MARTIAL 908, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.). The general issue is whether the military judge erred in suppressing evidence seized during a consent search of the appellee's barracks room. More specifically, the Government argues that the military judge erred in ruling that investigators exceeded the scope of the appellee's consent to search for child pornography. We agree that the military judge erred in his ruling.

### Facts

At trial, the appellee moved to suppress all evidence discovered during a consensual search and seizure of his personal computer and associated computer discs by a special agent (SA) of the Naval Criminal Investigative Service (NCIS). In attempting to show that the search and seizure was lawful, the Government called three witnesses and offered a Permissive Authorization for Search form, Appellate Exhibit VIII. With the exception of a service record page showing the appellee's history of assignments, Appellate Exhibit IX, the appellee declined to present any evidence. After hearing argument, the military judge issued detailed findings of fact and conclusions of law.

Except as noted later in this decision, we adopt the military judge's detailed essential findings of fact as our own. We include those findings [1] here to summarize the facts of this matter.

1. The accused has been charged at this general court-martial with knowingly possessing visual depictions of minors engaged in sexually explicit conduct that had been transported in interstate or foreign commerce in violation of 18 U.S.C. §§ 2252 and 2252A (as assimilated under Article 134, UCMJ, 10 U.S.C. § 934, and alleged alternatively). These charges were referred to this general court-martial (created on 29 January 2001) by Commander, Navy Region, Mid–Atlantic, on 25 June 2001.

2. On 07 February 2000, the accused was an 18–year–old active duty Navy member, and a student at the Naval Air Technical Training Center located in Pensacola, Florida. At that time he resided in military quarters, specifically, barracks room 219 located in Barracks "F," which he shared with AE3 David T. Webster, U.S. Navy. This barracks room was accessed by use of a pre-programmed computer "swipe" card. Among their various possessions, both the accused and AE3 Webster kept personal computers and associated equipment in their barracks room for their personal use and enjoyment.

3. On 07 February 2000, all parties to this motion are in agreement, and the court finds, that the accused enjoyed a reasonable expectation of privacy in both his barracks room, and in regard to his personal computer located therein.

4. After morning classes and lunch on 07 February 2000, AE3 Webster, the accused's roommate, returned to his barracks room and found the accused working on his computer, ostensibly downloading music from the "NAP-

STER" website. The accused asked AE3 Webster not to "mess with his computer" because he did not want to interrupt the downloading process. The accused departed the barracks room to return to class. AE3 Webster remained in the room.

5. AE3 Webster became suspicious of the accused's computer activities that afternoon. At the time, AE3 Webster believed, but was not certain, that he had seen the accused viewing images of child-pornography on his computer on two separate occasions in the month-and-a-half preceding 07 February 2000, and he believed the accused's computer activity that afternoon might be related to child-pornography.

6. AE3 Webster decided to ascertain what the accused was up to. He tapped on the computer keyboard and discovered that the accused was, in fact, downloading music from the Napster web-site. He then conducted an independent search of the accused's hard-drive files. He eventually located two computer images he believed to be child pornography. One depicted a nude, Asian girl holding a carrot; the other depicted 4 nude boys in a room on a mattress engaged in some form of sexual activity.

7. AE3 Webster then went down to the barracks quarterdeck and spoke to barracks staff members (also called "Military Training Instructors" ["MTI's"]) requesting a room change. When they inquired as to his reason for such a request, AE3 Webster stated words to the effect that his roommate, the accused, was viewing child-pornography on his personal computer located inside their room. The barracks staff contacted the Naval Criminal Investigative Service (NCIS), and AE3 Webster was instructed to return to classes.

8. Later that afternoon, when the accused and AE3 Webster returned to

---

1. In reciting the military judge's findings of fact verbatim, we choose to retain his footnotes and emphasis.

their room from class, they discovered that their computer "swipe" cards no longer opened their barracks door. Such an occurrence was not uncommon. Barracks personnel often "locked out" individuals from their rooms in order to get them to report to the quarterdeck for messages, assignments, etc. The evidence indicates that barracks personnel were responsible for the decision to lock the accused out of his room.

9. Special Agent Gary Marsh and Detective William Ramsey reported to Barracks "F" at approximately 1430 on the afternoon of 7 February 2000 to investigate the allegation that the accused was in possession of child pornography.

10. The accused and AE3 Webster went to the quarterdeck and reported that their "swipe" cards did not work. The accused was then instructed by either an NCIS agent or a barracks staff member to go into the "MTI" office, where he was addressed by Special Agent Marsh and Detective Ramsey.

11. AE3 Webster, the accused's roommate, was *never* interviewed by Special Agent Marsh or Detective Ramsey prior to their request for permissive search authorization from the accused, or their ultimate search of the accused's room. Accordingly, AE3 Webster never described to barracks personnel or NCIS the photos he had seen that day, or *where* he had seen them, prior to the accused's room being searched.

12. The office in which they were located was approximately 10 feet by 10 feet and contained a desk and at least one chair. Present in the room were the accused, Special Agent Marsh, Detective Ramsey, and a first class petty officer from the barracks staff ("MTI").

13. The accused was not advised of his Article 31(b), UCMJ, 10 U.S.C. § 831(b), rights at that time. Instead, Special Agent Marsh identified himself and advised the accused that he was "investigating a complaint of child pornography," and that he wanted the accused's consent to search his room and computer. The accused spontaneously stated words to the effect of, "Yeah, I have some, but I was going to get rid of it," or words to that effect. *Record at 33, 62.* There was no indication or clarification as to *where* the accused might "have some" child pornography.

14. Using appellate exhibit VIII, a "Permissive Authorization for Search and Seizure Form," Special Agent Marsh advised the accused that the Naval Criminal Investigative Service was conducting an investigation into the offense of "Child Pornography," and specifically requested the accused to permit a search of his "Barrack room (sic), "F", room 219, to include My Possessions, closet and personal Computer."

15. Appellate Exhibit VIII was completed in full by Special Agent Marsh in the presence of the accused.

16. Appellate Exhibit VIII informed the accused that he had a "constitutional right to refuse to permit this search in the absence of a search warrant." Appellate exhibit VIII states that "This search may be conducted on 07 Feb 00 by Special Agent(s) Gary Marsh and William Ramsey," and further states that, "I hereby give him/them my permission to remove and retain any property or papers found during the search which are desired for investigative purposes."

17. The accused signed this consent to search form, acknowledging that, "I make this decision freely and voluntarily and it is made with no threats having been made or promises extended to me." The accused read the form and appeared to understand its contents. Special Agent Marsh did not have the accused initial each paragraph of the form to reflect that he had read it and understood it. However, the accused indicated he under-

stood the form and its contents, asked no questions, and voiced no objection to the search being conducted as requested.

18. There is no evidence to indicate that the accused was in any way coerced or intimidated or misled by the environment in which the consent to search form was executed, or by the process utilized in explaining or executing the document.

19. After executing Appellate Exhibit VIII, the accused and Special Agent Marsh and Detective Ramsey all traveled to the accused's barracks room. The consent search began at 1540 and ended at 1615, a period of 35 minutes. Throughout the search, the accused was repeatedly requested to identify property that belonged to him, including his computer, which locker belonged to him, which computer discs and CD Roms were his, etc.

20. During the search, Special Agent Marsh elected to seize the accused's computer and numerous computer discs (11) and CD Roms (143) without first searching them to determine whether they contained any evidence of a crime (i.e., child pornography). *See Record at 80.* No child pornography was viewed in the accused's room, on the accused's computer, or on any computer discs or CD Roms found in the room on 07 February 2000. Special Agent Marsh then telephoned Special Agent Henry Pataky of the NCIS Gulf Coast Field Office, Pensacola Florida, the Coordinator of the Computer Operations and Investigations Units. Special Agent Pataky informed Marsh how to shut down the accused's computer from the "sleep mode." Both Marsh and Pataky were specifically concerned about the possible destruction or alteration of evidence contained on the computer if files were accessed without first being copied in full to preserve their original content.

21. Special Agent Marsh and/or Detective Ramsey *did* search the computer of AE3 Webster (with Webster's consent) by turning it on and specifically viewing images contained thereon. They seized nothing belonging to AE3 Webster. Special Agent Marsh disclaims any memory of having searched AE3 Webster's computer.[2]

22. At the time the accused's computer, computer discs, and CD Roms were seized and removed from his room, no actual child pornography had been discovered or viewed. Ultimately, these items were logged onto an NCIS evidence custody document (ECD) and placed into the evidence storage locker at the NCIS field office in Pensacola. Special Agent Marsh was that office's evidence custodian. A request for forensic analysis of both the computer and the discs was submitted on or about 09 February 2000.

23. The accused never attempted to withdraw or limit his consent beyond that which he agreed to in appellate exhibit VII(sic). The accused never expressly objected to the seizure of his computer, computer discs, or CD Roms, and, to date, has not requested their return.

24. Special Agent Pataky conducted the forensic analysis of the accused's computer and computer discs/CD'Roms on or about early April 2000, approximately two months after the 07 February 2000 seizure of the evidence. This two-month delay was due to numerous other cases being worked that chronologically preceded that of the accused. Special Agent Pataky finished his forensic report on 02 May 2000, approximately three months after the evidence was seized.[3]

Appellate Exhibit X.

### Discussion

 When the Government appeals a ruling by a military judge, we may act only

2. Special Agent Marsh, throughout his testimony, was frequently "unable to remember" various specifics of what took place on 07 February 2000.

3. The prosecution failed to present any evidence

with respect to matters of law, notwithstanding the provisions of Article 66(c), UCMJ, 10 U.S.C. § 866(c). Art. 62(b), UCMJ, 10 U.S.C. § 862(b). We review a military judge's ruling on a motion to suppress for an abuse of discretion. *United States v. Reister,* 44 M.J. 409, 413 (1996). We approve the military judge's findings of fact, unless they are clearly erroneous or unsupported by the record. *Id.* We review conclusions of law *de novo. Id.*

We begin our analysis with the findings of fact. Finding of fact number 7 states, in part, that AE3 Webster told the MTIs that the accused "was viewing child-pornography on his personal computer located inside their room," or words to that effect. Appellate Exhibit X. While the MTIs may have surmised that some child pornography was on the accused's computer, the record only supports a finding that AE3 Webster told SA Marsh that the accused had the material on his laptop. Record at 44. To that limited extent, finding of fact number 7 is disapproved. Otherwise, the findings are supported by the record.

 The Fourth Amendment to the U.S. Constitution mandates that, "[t]he right of the people to be secure ... against unreasonable searches and seizures, shall not be violated." The "touchstone of the Fourth Amendment is reasonableness." *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)(citing *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). Reasonableness is measured in objective terms by examining the totality of the circumstances. *Id.* A search conducted pursuant to one's voluntary consent is reasonable, and thus, constitutionally permissible. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Frazier,* 34 M.J. 135, 137 (C.M.A.1992); MIL. R. EVID. 314(e), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.). The scope of any consent search may not exceed the scope of the actual consent given. *Florida v. Jimeno,* 500 U.S. at

251, 111 S.Ct. 1801 ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). "The scope of a search is generally defined by its expressed object." *Id.*

 We now consider the military judge's conclusions of law. In granting the motion to suppress evidence seized during the search, the military judge ultimately concluded that NCIS investigators "greatly and unreasonably exceeded the consent to search given them by the accused when they seized his computer and discs on 07 February 2000 without searching them, and thereafter held them without searching them until April 2000." Appellate Exhibit X at 6. This conclusion is based on the military judge's reading of the Permissive Authorization for Search and Seizure Form (hereinafter referred to as "consent form"), specifically, the language: "the search may be conducted on 07 Feb 00." Appellate Exhibit VIII. Because (1) the search of the contents of the computer and associated discs was not completed on 7 February, and (2) the appellee never specifically agreed to a seizure and subsequent analysis, the military judge concluded that the NCIS actions were unreasonable. Appellate Exhibit X.

As we read the NCIS consent form, the dispositive language is:

> This search may be conducted on 07 Feb 00 by Special Agent(s) Gary Marsh and William Ramsay **and I hereby give him/them my permission to remove and retain any property or papers found during the search which are desired for investigative purposes.**

Appellate Exhibit VIII (emphasis added). Given the plain language of this provision, we believe that the military judge took the first phrase ("This search may be conducted on 07 Feb 00 by Special Agents Gary Marsh and William Ramsay") out of context without giving appropriate consideration to the meaning

or testimony that established that visual depictions of minors engaged in sexual activity (i.e., child pornography) were actually discovered on the accused's computer hard-drive, or on computer discs/CD-Roms seized from the accused. For purposes of this motion, the Court has presumed that an "unspecified" number of such visual images were found.

of the remainder of the sentence. While the appellee did not expressly consent to a period of 3 months of NCIS seizure and retention of his property, the plain language of the consent form clearly states he agreed to allow the investigators to remove and retain his property for investigative purposes. In other words, the appellee consented to a seizure of his property. If the appellee believed that retention for 3 months was unreasonable, he never said so. We hold that, in this case, the consensual seizure and subsequent retention for 3 months was not unreasonable.[4]

We are fortified in our conclusion by the testimony of SA Marsh and SA Pataky. These two witnesses explained that effective forensic analysis of a computer hard drive for child pornography is more complicated than a few keystrokes and mouse clicks. Their testimony also revealed that criminals in possession of computer-stored child pornography may use software designed to automatically erase certain files if someone else tries to access those files. Thus, if a "hot key" is inadvertently touched, critical evidence may be lost. Standard procedure in such investigations calls for shutting the computer down, transporting it to the forensic analysis site, copying the hard drive, and then conducting careful forensic analysis. All of this must be done by, or under the supervision of, a trained computer forensic analyst.

We note that, as alluded to in the findings of fact, SA Marsh acted in accordance with established NCIS policy in not attempting to search the computer's files on site, but instead, carefully shut down the computer as instructed by SA Pataky and carried it and the associated discs, and CD–ROMS back to the forensic laboratory for analysis. Since only two trained special agents were available to conduct this analysis for such cases in a 22–state area, a first-in-first-out process was followed. When this case was taken out of the queue for analysis, SA Pataky first copied the hard drive, then employed specialized software to search the hard drive, discs and CD–ROMs for files containing child por-

nography. Of particular interest is SA Pataky's testimony that conducting and recording the forensic analysis of the appellee's computer, 11 discs, and 143 CD–ROMs required approximately 2 weeks.

Although the types of issues inherent in this computer search and seizure are relatively new, we are not the first court to confront them. In *United States v. Upham,* the United States Court of Appeals for the First Circuit was asked to decide whether a warrant authorizing search and seizure of "[a]ny and all computer software and hardware, ... computer disks, disk drives ... [and][a]ny and all visual depictions ... of minors engaging in sexually explicit conduct" was unconstitutionally overbroad. *United States v. Upham,* 168 F.3d 532, 535 (1st Cir.1999), *cert. denied,* 527 U.S. 1011, 119 S.Ct. 2353, 144 L.Ed.2d 249 (1999). A related issue was whether the scope of the warrant was exceeded when the Government recovered previously deleted images from the hard drive and disks. *Id.* at 536. In holding against the defendant, the Court made this observation:

> Of course, if the images themselves could have been easily obtained through an onsite inspection, there might have been no justification for allowing the seizure of all computer equipment, a category potentially including equipment that contained no images and had no connection to the crime. But it is no easy task to search a well-laden hard drive by going through all the information it contains, let alone to search through it and the disks for information that may have been "deleted." The record shows that the mechanics of the search for images later performed off site could not readily have been done on the spot.

*Id.* at 535; *see Guest v. Leis,* 255 F.3d 325, 335 (6th Cir.2001)("Because of the technical difficulties of conducting a computer search in a suspect's home, the seizure of the computers, including their content, was reasonable in these cases to allow police to locate the offending files"); *see also United States*

---

4. Although we hold that 3 months is constitutionally permissible here, we also believe that an excessively long period of retention, following a lawful seizure, could be unreasonable. We de-

cline to try to draw a "bright-line" that would apply in all circumstances. Each case must be considered on its own facts.

*v. Scott–Emuakpor,* 2000 WL 288443, *7, 2000 U.S.Dist. LEXIS 3118 (W.D.Mich. 2000)(slip op. at 19)("It is true that the agents seized items other than hard drives and disks such as monitors and keyboards which did not contain computer files. However, the seizure of those items was reasonable because it allowed the agents to preserve the computer system as it existed for the computer analysts, who were not present during the search, without taking the risk of losing any files."). We note that these cases involved search warrants vice consent. But, we see no reason why their reasoning should not apply to the facts of this case in determining whether NCIS special agents exceeded the scope of consent, and ultimately, whether the search and seizure was reasonable.

On 7 February 2000, the appellee consented to an NCIS search of his barracks room and personal property therein, specifically including his computer. He also consented to NCIS seizure and retention of any property found during the search that was desired for "investigative purposes." Appellate Exhibit VIII. The totality of the circumstances clearly show the voluntariness of that consent. NCIS found nothing of investigative value in the room search. That left the appellee's computer as the remaining "object" of the search. *See Florida v. Jimeno,* 500 U.S. at 251, 111 S.Ct. 1801. In view of (1) the plain language of the consent search form, and (2) the technical difficulties of an on-site computer search, we conclude that NCIS acted reasonably and did not exceed the scope of the appellee's consent. Taking into account all of the facts and circumstances, we conclude that this was clearly a reasonable search and seizure.

### Conclusion

Based on our review of the record, we hold that the military judge erred in his application of the law. Accordingly, the military judge's ruling is reversed. The appellee's court-martial may proceed to trial. R.C.M. 908(c)(3).

Judge VILLEMEZ and Judge OZMUN concur.