**UNITED STATES**

v.

**Joshua S. DANIELS, Electronics Technician Seaman Apprentice (E–2), U.S. Navy.**

**NMCM 200001604.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 10 May 2000.

Decided 27 March 2003.

---

6. Judge Advocate General Instruction 5803.1B, Rule 3.4(a)(4)(11 Feb 2000).

CAPT Bruce H. Bokony, JAGC, USNR, Appellate Defense Counsel.

CDR George F. Reilly, JAGC, USN, Appellate Defense Counsel.

CDR Robert P. Taishoff, JAGC, USN, Appellate Government Counsel.

LTCol K.P. Kelly, USMCR, Appellate Government Counsel.

Before OLIVER, Senior Judge, VILLEMEZ, and HARRIS, Appellate Military Judges.

OLIVER, Senior Judge:

A military judge, sitting as a special court-martial, convicted Appellant, consistent with his pleas, of wrongfully possessing cocaine, in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a. On 10 May 2000, the military judge sentenced Appellant to confinement for 45 days, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the sentence and, except for the bad-conduct discharge, ordered it executed. The pretrial agreement had no effect on the sentence.

We have carefully reviewed the record of trial, Appellant's single assignment of error, the Government's response, and Appellant's reply. We conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of Appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Issue Presented

At trial, the parties litigated a defense motion to suppress the only evidence of Appellant's possession of cocaine. After hearing testimony and ruling that the cocaine was admissible as evidence on the merits, the military judge permitted Appellant to enter a conditional plea of guilty to the Charge and Specification under RULE FOR COURTS-MARTIAL 910(a)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.); see United States v. Monroe, 50 M.J. 550, 553 (A.F.Ct.Crim. App.1999). Appellant thus preserved the evidentiary issue.

On appeal, Appellant contends that the military judge erred by allowing the introduction of the vial containing cocaine into evidence. He argues that it was obtained through an illegal search and seizure in violation of his rights under the Fourth Amendment to the U.S. Constitution and Military Rule of Evidence 311(a), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.).

Although we acknowledge that the question is a close one, we find that the military judge was correct when he ruled that there was no violation of Appellant's rights in how the cocaine came into the possession of the Government. Therefore, Appellant is not entitled to any relief. The applicable facts of the case and our legal analysis follow.

### Applicable Facts

While a student at Naval Submarine School, Appellant shared a room in the barracks on Naval Submarine Base New London, Connecticut, with two other students: Electronics Technician Seaman Apprentice (ETSA) Collinge and ETSA Voitlein. Their room consisted of: (1) three racks: a bunkbed for ETSA Collinge and ETSA Voitlein; and an individual rack for Appellant; (2) three wall lockers and wall units, which were separately assigned to each occupant and bore the name tag of each; (3) four nightstands, which had neither name tags nor locks; and (4) a common-use refrigerator.

Appellant kept his phone book, pictures, manila mailing envelopes, letters, candy, snuff tobacco, and cigarettes in the top drawer of one nightstand located between the beds. Appellant used that particular nightstand on a daily basis. The testimony established that only he stored possessions in its top drawer.

On the evening of 29 March 2000, Appellant entered his barrack's room holding a brown plastic vial. He displayed this vial to ETSA Collinge and ETSA Voitlein, claiming that it contained cocaine mixed with a tranquilizer. Appellant then placed the vial in a can of snuff tobacco in the top drawer of his nightstand that was between the beds. Neither ETSA Collinge nor ETSA Voitlein talked to Appellant about the vial or its contents.

At 0630 the following morning, 30 March 2000, a chief petty officer and a petty officer conducted the regular weekly inspection of Appellant's room. Because Appellant and ETSA Collinge were both in class at the time, only ETSA Voitlein was present for the routine inspection. ETSA Voitlein testified that, because he did not know either member of the inspection team, he "was kind of like scared" to tell them about the vial in Appellant's nightstand. Record at 64. The room inspection uncovered nothing unusual.

Shortly after the room inspection, ETSA Voitlein searched out Electronics Technician Chief Petty Officer (ETC)(SS) Wilt, a Military Training Instructor whom he knew fairly well. ETSA Voitlein told Chief Wilt that he thought Appellant was "doing drugs." Record at 65, 79. ETSA Voitlein and Chief Wilt then discussed what had transpired the previous evening. Chief Wilt asked whether the vial was still in the room. ETSA Voitlein responded that the vial was in a nightstand dresser drawer. Although Chief Wilt clearly did not believe that illegal drugs were actually in the drawer, he told ETSA Voitlein to go get the vial, because he was busy debriefing the inspection team.

ETSA Voitlein returned to the room and retrieved the vial from inside the snuff tobacco can where Appellant had placed it in the top drawer of the nightstand the previous night. He then delivered the vial to Chief Wilt. Although Chief Wilt directed ETSA Voitlein to retrieve the vial, at the time he did not suspect Appellant to be in possession of any illegal substances. Rather, he surmised that Appellant had been merely joking with his roommates. Subsequent testing, however, revealed that the vial ETSA Voitlein recovered contained some amount of cocaine.

At trial, Appellant made a timely motion pursuant to R.C.M. 905(b)(3), to suppress the cocaine that was found in the vial. In his motion, he argued the cocaine was inadmissible pursuant to Mil. R. Evid. 311(a). Appellant argued that ETSA Voitlein, acting as an agent of the Government on the orders of Chief Wilt, searched the top drawer of his nightstand in which he stored his personal effects, searched his can of snuff tobacco,

seized the vial, and then gave it to Chief Wilt, all without his authorization. For his part, Chief Wilt turned the vial over to law enforcement personnel for testing. These tests proved positive for cocaine.

In its response to the motion at trial, the Government argued the cocaine was admissible because: (1) Appellant had no reasonable expectation of privacy in either the nightstand or the can of snuff tobacco; (2) ETSA Voitlein was acting in a private capacity at the time of the seizure and not in any governmental capacity; (3) ETSA Voitlein had the authority to consent to the search of the nightstand and the can of snuff tobacco; and (4) the Government would inevitably have discovered the cocaine anyway. On appeal, the Government is arguing only the second basis, that ETSA Voitlein was a "non-government agent" and there was "no quest for evidence by a person acting under color of authority," to support the military judge's decision to admit the evidence. On the unique facts of this case, we find that this is the only appropriate basis for admitting the evidence.

The military judge ruled at trial that, although Appellant did have an expectation of privacy in the nightstand and its contents and that this expectation was reasonable, introduction of the cocaine seized from the vial in the nightstand was proper. The military judge found that ETSA Voitlein was acting in a "purely private capacity" when he found the contraband. Therefore, he ruled that the search of the nightstand and seizure of the cocaine did not have to be excluded from evidence under Mil. R. Evid. 311(a). Appellate Exhibit IV (Findings and Order).

## Discussion

The Fourth Amendment to the U.S. Constitution provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Military Rules of Evidence 311 through 317 "express the manner in which the Fourth Amendment to the Constitution of the United States applies to trials by court-martial." MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.),

App. 22–17. Military Rule of Evidence 311(a) provides:

> *General rule.* Evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if:
>
> (1) *Objection.* The accused makes a timely motion to suppress or an objection to the evidence under this rule; and
>
> (2) *Adequate interest.* The accused had a reasonable expectation of privacy in the person, place, or property searched; the accused had a legitimate interest in the property or evidence seized. . . .

In ruling on the motion, the military judge concluded that, in effecting the search of Appellant's nightstand top drawer and removing the vial of cocaine from that drawer, ETSA Voitlein acted in a "purely private capacity." Appellate Exhibit IV at 3. This fact insulated his conduct from the exclusionary provisions of Mil. R. Evid. 311(a). The military judge summarized the issue as follows:

> The key to the government's case is [ET]SA Voitlein's role. If he was acting as a private party, then his searching for and seizing the can of snuff that contained the vial of cocaine did not violate the Rule of Evidence [311] nor its constitutional underpinnings. *See, e.g., United States v. Portt,* 21 M.J. 333, 334 (C.M.A.1986). Conversely, if he was acting as an agent of the government, then his actions did violate those standards.

Appellate Exhibit IV at 3.

## Standards of Review

 This Court is to review a military judge's denial of a motion to suppress evidence for an abuse of discretion. *United States v. Khamsouk,* 57 M.J. 282, 286 (2002); *United States v. Monroe,* 52 M.J. 326, 330 (2000). We apply a "clearly erroneous" standard to the military judge's essential findings of fact, and conduct a *"de novo* review" of the military judge's conclusions of law. *See United States v. Bruci,* 52 M.J. 750, 753–54 (N.M.Ct.Crim.App.2000). Our superior Court put it as follows:

A military judge's evidentiary ruling is reviewed for abuse of discretion. Findings of fact will not be overturned unless they are clearly erroneous or unsupported by the record. Conclusions of law are reviewed *de novo*. In reviewing a ruling on a motion to suppress, we consider the evidence "in the light most favorable to the" prevailing party. "We will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law."

*United States v. Reister*, 44 M.J. 409, 413 (1996)(quoting *United States v. Sullivan*, 42 M.J. 360, 363 (1995); *United States v. Kitts*, 43 M.J. 23, 28 (1995); *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir.1993)). We agree with our learned colleague that we need to analyze the military judge's determinations below as mixed questions of law and fact.

### Legal Analysis

■ In analyzing a Fourth Amendment evidentiary issue such as this one, a military judge should consider the following two questions:

(1) Did the accused have a reasonable expectation of privacy in the area searched and in the property seized? and

(2) Was the person who conducted the search and seized the property acting as an agent of the Government in a quest for evidence of a crime at the time?

Only if the answer to each of these two questions is "yes" should the military judge exclude the evidence.

The military judge first found that Appellant had a reasonable expectation of privacy in the contents of the dresser drawer. In this regard, the U.S. Supreme Court has stated that:

Our Fourth Amendment analysis embraces two questions. First, . . . whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that "he [sought] to preserve [something] as private." . . . Second, . . . whether the individual's expectation of privacy is "one that society is prepared to recognize as reasonable."

*Bond v. United States*, 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) (citations omitted). *See also Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)(Harlan, J., concurring). In *United States v. Portt*, 21 M.J. 333, 334 (C.M.A. 1986), the opinion the military judge cited in his written ruling, our superior Court opined: "The determination of whether a reasonable expectation of privacy exist[s] is a legal conclusion." The *Portt* Court continued: "In considering reasonableness, we must determine 'whether a person invoking the protection of the Fourth Amendment took normal precautions to maintain his privacy—that is, precautions customarily taken by those seeking privacy.'" *Portt*, 21 M.J. at 334 (quoting *Rakas v. Illinois*, 439 U.S. 128, 152, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978))(Powell, J., concurring).

The *Portt* opinion continued: "Generally, a warrantless search of a government locker assigned for the personal use of a military member, particularly if the locker were located in living quarters, would be unreasonable, as such lockers are in a class of effects in which there exists a legitimate expectation of privacy." *Id.* at 335. In its brief, the Government has conceded that the military judge's conclusion to this effect was correct. We agree fully with the military judge's finding that Appellant had a reasonable expectation of privacy in the drawer and its contents.

■ We now turn to the second question: Was ETSA Voitlein acting as an agent of the Government in a quest for evidence of a crime at the time he conducted the search and made the seizure? This issue requires further analysis.

It is well-settled that the "Fourth Amendment is a restriction only against government action; and the fruits of a search and seizure by a private person are not subject to the exclusionary rule." *United States v. Baker*, 30 M.J. 262, 266 (C.M.A.1990). In *United States v. Jacobsen*, 466 U.S. 109, 113–14, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the U.S. Supreme Court observed:

This Court has also consistently construed [the Fourth Amendment] protection as proscribing only governmental action; it is

wholly inapplicable "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *Walter v. United States,* 447 U.S. 649, 662, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980)(Blackmun, J. dissenting).

It is equally well-settled that the warrantless search and seizure of the personal effects of an individual by a Government agent is *"per se* unreasonable" and would normally constitute a violation of the Fourth Amendment. *Katz,* 389 U.S. at 357, 88 S.Ct. 507. *See also* MIL. R. EVID. 311(a); *Reister,* 44 M.J. at 415.

The Supreme Court articulated the following guideline to determine if the warrantless search by a private individual violates the Constitution: "The test ... is whether Mrs. Coolidge, in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state when she produced her husband's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *see Reister,* 44 M.J. at 415. In *Coolidge,* the Supreme Court continued: "[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." 403 U.S. at 488, 91 S.Ct. 2022.

Military Rule of Evidence 311(c)(1) provides: "A search or seizure is 'unlawful' if it was conducted, instigated, or participated in by ... [m]ilitary personnel or their agents and was in violation of the Constitution of the United States as applied to members of the armed forces." Our superior Court has observed: "The Fourth Amendment and Mil. R.Evid. 311 are not violated when a military member acts in a purely private capacity." *Sullivan,* 42 M.J. at 363–64.

After hearing evidence, reviewing the legal briefs, and considering arguments, the military judge determined that ETSA Voitlein was acting in a "purely private capacity" when he conducted the search and recovered the vial containing cocaine. In reaching his finding, the military judge acknowledged that ETSA Voitlein retrieved the vial of cocaine only after the directive given by Chief Wilt:

"It is true that he picked up the vial only after he had been provided guidance by ETC(SS) Wilt...." Appellate Exhibit IV at 3. The military judge ruled that the role of Chief Wilt in the search was irrelevant, a "red herring." *Id.* The military judge focused solely on the underlying motivation of ETSA Voitlein. He concluded that ETSA Voitlein was acting based on his private motivations.

Although we agree with the military judge's ultimate conclusion, we find Chief Wilt's knowledge and motivation equally, if not more, important. Indeed, the determining factor in whether or not the cocaine seizure was constitutional is what motivated Chief Wilt's directions to ETSA Voitlein. Were his directions part of a "search" in a "quest" for incriminating evidence? *See generally Dow Chemical Co. v. United States,* 476 U.S. 227, 230, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). If so, we would find that Chief Wilt's statement, "Go and get it," would have made ETSA Voitlein his agent in such a quest. Under the unique circumstances of this case, however, we find that Chief Wilt was simply not engaged in a quest for evidence of a crime. While his purported "agent" may have been so engaged based on his own motivation, we find that Chief Wilt, as the key governmental actor, was not.

The facts of record establish the genuine pre-search concern and sincerity on the part of ETSA Voitlein. In his testimony, he indicates he did not really want to know what was going on with Appellant that night in their room. However, what he did hear and observe bothered him enough so that it caused him not to sleep well, as he "thought about it all night." Record at 61, 71. However, he failed to effectively or convincingly communicate this concern to Chief Wilt.

Chief Wilt's immediate response to ETSA Voitlein was to ask him the basis for his suspicions. ETSA Voitlein responded that Appellant had possessed illegal drugs in their room the previous evening. In his testimony at trial, Chief Wilt stated:

So I sort of snickered when he claimed, you know, because then I said, "Well what do you mean he showed you the drugs?"

And he said, "Well he held up a vial or something." And I said, "Well what did it look like, what was it?" And he said, "Well I really wasn't paying attention I was laying down trying to get to sleep. I really just didn't want to have anything to do with it."

Record at 79–80.

Chief Wilt indicated that while he had not previously suspected Appellant of being associated with illegal drugs, he did know that Appellant "was ADHD" and might be taking medication, such as Ritalin, for that condition.[1] *Id.* at 81. When asked if he actually suspected Appellant of possessing illegal substances even after ETSA Voitlein's expressions of concern, Chief Wilt repeatedly stated that he did not. *Id.* at 81, 82, 92–93. Even ETSA Voitlein perceived that fact after he spoke with Chief Wilt and was directed to return to the room and retrieve the questioned vial. When the military judge questioned ETSA Voitlein about why Chief Wilt did not accompany him to the room, the following exchange took place:

Q: Was it your impression ... that [Chief Wilt] was busy and he couldn't physically remove himself from where he was or did he seem to indicate that there was some sort of prohibition on his going up there.

A: I think it was more disbelief.

Record at 70.

Chief Wilt explained that he knew Appellant, based on prior "encounters" with him concerning "minor infractions" involving his failure to maintain proper room and uniform standards. *Id.* at 81–82. Chief Wilt stated that he expected when ETSA Voitlein returned from getting the questioned item from the barracks room as directed, "he was going to bring back a syringe of like flour, sugar, or something to that effect. Something-a joke in other words." *Id.* at 82. Chief Wilt's testimony clearly established his belief that Appellant had merely been playing a "joke" on his roommates. *Id.*

In response to subsequent questioning by the military judge, Chief Wilt indicated that prior to the day in question, ETSA Voitlein had expressed displeasure with some things Appellant had been doing. When asked if that prior knowledge of the apparently strained relationship between the two was a factor in his initial disbelief of ETSA Voitlein's statement about Appellant having drugs in the barracks, Chief Wilt responded that he believed that Appellant was merely "irritating his roommate." *Id.* at 91.

If Chief Wilt had believed illegal drugs were in Appellant's room, we are fully confident that he would have responded to ETSA Voitlein's concern in a much different manner. As experienced military officers, there is no doubt in our collective minds that no chief petty officer in the U.S. Navy would give priority to a discussion about dust and gear adrift over the seizure of illegal drugs from the barracks. Had Chief Wilt believed that there could have been illegal drugs in the barracks, we are confident that he would have postponed his participation in the post-inspection debriefing until the matter of the illegal drugs had been properly addressed.

Given Chief Wilt's honest belief that ETSA Voitlein's expressed concerns about Appellant actually having illegal drugs in their barracks room were unreasonable, we conclude that Chief Wilt's directions did not make ETSA Voitlein a Government agent on a quest for incriminating evidence. That being the case, there was no "search" for which the Government is legally responsible such that it falls under the penumbra of the exclusionary remedy of Mil. R. Evid. 301(a). A "search" that would have such implications is defined as: "An examination of a person's body, property, or other area that the person would reasonably expect to consider as private, conducted by a law enforcement officer for the purpose of finding evidence of a crime." BLACK'S LAW DICTIONARY 1351 (7th ed.1999). In *United States v. Hillan*, 26 C.M.R. 771, 791, 1958 WL 3481 (N.B.R.1958), the Navy Board of Review defined such a "search" as "a 'quest' or a 'looking for' evi-

---

1. Although not further defined in the record of trial, based on the context in which it was used and its association with the drug Ritalin, we presume that "ADHD," as used in Chief Wilt's testimony, stands for Attention Deficit/Hyperactivity Disorder. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM–IV) 78–85 (4th ed.1994).

dence of guilt to be used in a prosecution of a criminal action."

Moreover, we find that when ETSA Voitlein actually seized the incriminating evidence, he was doing so out of a "private motivation" to protect his "own personal interests." Among other things, including his desire to get the illegal drugs out of his room and thus insulate himself from possible criminal liability, ETSA Voitlein wanted to prove himself correct with respect to his representations to Chief Wilt. These private motivations insulated his action from the protections of the Fourth Amendment and the exclusionary effect of Mil. R. Evid. 301(a). *See United States v. Jacobs*, 31 M.J. 138, 143 (C.M.A.1990), and *United States v. Volante*, 4 C.M.A. 689, 691, 16 C.M.R. 263, 267, 1954 WL 2451 (1954); *see also United States v. Faucett*, 50 C.M.R. 894, 896, 1975 WL 15779 (A.F.C.M.R.1975).

The results of a "private" search do not implicate one's Fourth Amendment protections and the exclusionary rules of evidence. *See Jacobsen*, 466 U.S. at 115, 104 S.Ct. 1652; *Reister*, 44 M.J. at 415–16; *Portt*, 21 M.J. at 334; *Bruci*, 52 M.J. at 753–54. We hold that the military judge was correct when he concluded that "the facts do not support a finding that there was a search by a government official of the drawer." Appellate Exhibit IV at 3.

In *Portt*, the opinion the military judge cited in his written findings of fact and conclusions of law, our superior Court held that even the actions of a military policeman, when acting in a non-law enforcement capacity, do not fall within the parameters of the

Fourth Amendment's protections. *Portt*, 21 M.J. at 334. Thus, even if one concludes that ETSA Voitlein received a derivative official-capacity/law-enforcement cloak of authority, which under the appropriate circumstances might bind the Government to the consequences of his actions, at the point when Chief Wilt sent him back to retrieve the questioned vial, we find that ETSA Voitlein, like the military policeman in *Portt*, seized the vial as "a private individual not acting as an agent of the Government." *Id.*

For the reasons discussed above, we hold that the military judge ruled correctly that the questioned search and seizure did not violate the protections of the Fourth Amendment and the protections of Mil. R. Evid. 301(a). Therefore, Appellant is entitled to no relief.

### Conclusion

Accordingly, we affirm the findings and sentence, as approved on review below.

Judge HARRIS concurs.

VILLEMEZ, Judge (dissenting).

"When we assumed the Soldier, we did not lay aside the Citizen ...." [1]

General George Washington; Address to the Legislature of New York, 26 June 1775

This is a very visceral case, the complexity of which is dictated by its appearance of simplicity. In actuality, it is one with underlying judicial challenges belied by its at-first-glance facade of being a fundamentally "simple" case.[2] Within its four corners, the appropriate outcome of the case *feels* clear;

---

1. General Washington's entire statement was: "When we assumed the Soldier, we did not lay aside the Citizen; and we shall most sincerely rejoice with you in that happy hour when the establishment of American Liberty, upon the most firm and solid ground, shall enable us to return to our Private Stations." RAYMOND V. HAND, JR., EXECUTIVE EDITOR, THE GIANT BOOK OF AMERICAN QUOTATIONS 25:27 at 85 (1999 ed.).

2. Saying that this is a "simple" case in no way implies that it is an *easy* one, with answers anyone should be able to readily see and agree upon. When first considering the facts, the "reasonable" outcome of the case *seems* simple and clear, but upon closer consideration—through the deliberative process of applying case facts to the relevant and applicable concepts of law—it

quickly becomes evident that getting to the ultimate answer, in fact, is a very difficult task. When that process is finally completed and the case outcome begins to take focus, however, the "answer" once again *appears* to be simple, regardless of where and on which "side" an individual finally settles on the issues. Thus, this case presents many judicial challenges, whose *alpha* and *omega* reflect a mirage of simplicity, when, in reality, it is a case with complex issues upon which reasonable minds certainly may legitimately differ. *"Alpha"* and *"omega"* are the first and last characters, respectively, of the Greek alphabet. WILLIAM MORRIS, EDITOR, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 38 (1976).

however, it is a vivid illustration of the distinction between "legal" and "moral" guilt. It is an example of a case where one is not the mirror image of the other.[3]

An illicit drug—cocaine—was found in the appellant's personal possessions in his barracks room onboard Naval Submarine School, Groton, Connecticut.[4] The appellant had a pretrial agreement, by which the convening authority gave him confinement protection in return for his guilty plea. The appellant also executed a stipulation of fact in which he admitted his guilt. As promised, the appellant plead guilty at his special court-martial, after making, but losing, a motion seeking to suppress consideration of the cocaine—the very *corpus* of his crime—by the court, with the evidentiary issue being preserved for appellate review per RULE FOR COURTS-MARTIAL 910(a)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.).

Factually, there is no doubt the appellant committed the offense as alleged. Thus, he may be seen as "morally" guilty of wrongfully possessing cocaine in his barracks room, a serious offense that is inimical to good order and discipline and the military mission. I respectfully disagree, however, with the majority opinion, which finds he is also "legally" guilty. I believe the act resulting in the seizure of the cocaine from a place everyone seems to agree was one in which the appellant had a reasonable expectation of privacy at the time was not a "private" search. I believe it was an improper search conducted "by a person acting in a governmental capacity," and that the seized cocaine should have

been excluded from consideration at the appellant's court-martial. MIL. R. EVID. 311(a), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.). By disagreeing with the majority's analysis of the legal issue concerning the validity of the search itself, consequently, I differ in the application of the standard of review to the military judge's evidentiary ruling.

### Standard of Review

"The proper standard of review—that is, the proper degree of deference an appellate court owes to any aspect of the lower court's decision—is a threshold issue in an appellate decision. It should be the starting point for the resolution of each separate issue in appeal." O'Neill, *Standards of Review in Illinois Criminal Case: The Need for Major Reform*, 17 So.ILL.U.L.J. 51 (1992), as quoted in 5 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.7(c) at 398 (3rd ed.1996)[hereinafter SEARCH AND SEIZURE].[5]

I concur with the majority's general statement of the appropriate standard of review for this case, in that this Court reviews a military judge's denial of a motion to suppress proposed evidence for an abuse of discretion, with findings of fact not being overturned unless clearly erroneous and conclusions of law being reviewed *de novo*. As our senior Court has stated regarding the review of a military judge's evidentiary ruling: " 'We will reverse ... if [the military judge's] decision is influenced by an erroneous view of the law.' " *United States v.*

---

3. In the realm of criminal law, I would distinguish between "legal" and "moral" guilt as follows: If one *in fact* does a prohibited act, he or she is "morally" guilty of the offense. To also be found "legally" guilty of the act (and, therefore, be formally punished under our legal system) the individual also would have to be so found per the rules, standards, and procedures that form the basis of the judicial proceedings considering the charged offense. Hopefully more often than not the two match up in a given case; however, sometimes, as in—I believe—this case, they do not. *See* BLACK's LAW DICTIONARY (7th ed.1999) at pages: (1025) Morality: Conforming with recognized rules of correct conduct; (1606) Moral wrong: An act that is contrary to the rule of natural justice; (905) Legally: In a lawful way; in a manner that accords with the law.

4. While the appellant thought the substance he purchased on the street was ketamine, he admitted in the providence inquiry that: he knew his possession of ketamine was illegal; and he believes that the field test on the substance revealed it to actually be cocaine. Record at 128–30. "Ketamine as 'Special K' or 'K' has become a staple at 'rave' parties.... [I]t became a Schedule III substance under the Federal Controlled Substances Act." U.S. Department of Justice, Drug Enforcement Administration, Diversion Control Program: "Ketamine" at http://www.deadiversion.usdoj.gov/drugs_concern/ketamine/summary.htm.

5. For an excellent discussion of standards of appellate review, *see* 5 LAFAVE, SEARCH AND SEIZURE § 11.7(c) at 398–415.

*Reister,* 44 M.J. 409, 413 (1996)(quoting *United States v. Sullivan,* 42 M.J. 360, 363 (1995)). I believe this to be the situation in this case, in that the military judge misapplied the law dealing with "private searches" to the facts of this case.

In reviewing factual determinations made by a trial judge—an empirical type process to establish the who-what-why-when-and-how factors in a case—appellate courts should pay a high degree of deference to the trial court, which is in the better position to evaluate and weigh the pertinent evidence relating to factual issues, while making credibility determinations during the live, in-court testimony of witnesses. Legal conclusions, however, require no such logical deference, as the appellate court, without the immediate and pressing duties and responsibilities involved in a live, ongoing trial, is in a just-as-good, or perhaps in a better position to examine questions of law with its collaborative, deliberative process.

Applying the fact-law distinction is complicated, however, in cases such as this one, with its mixed question of fact and law. The difficulty exists in attempting to "unmix" the issues, in order to be able to apply the clearly-erroneous standard to the factual aspects or issues, while reviewing the legal issues *de novo.* If uncertainty exists as to whether an issue is strictly a question of "fact" or of "law" in a case with questions that involve Constitutional rights, it should be reviewed, I believe, *de novo. See Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); 5 LaFave, SEARCH AND SEIZURE § 11.7(c) at 404–06.

### Application

I believe the military judge's pronouncement concerning the characterization of the search conducted by Electronics Technician Seaman Apprentice (ETSA) Voitlein, at the specific direction of Electronics Technician Chief Petty Officer (ETC)(SS) Wilt, is not a finding of fact, but rather a mixed question of fact and law.[6] Thus, the underlying facts, as determined by the military judge, should be severed and reviewed under a clearly-erroneous standard, while the ultimate question as to whether the established facts add up to a "private search" being conducted by ETSA Voitlein should be considered *de novo* by this Court.

The determination of whether the search in issue in this case was "private" or Government-sanctioned is not driven by just a "factual determination," such as, perhaps, in those cases where the issue is whether "consent" to a search was or was not given.[7] Rather, herein, it is a matter of applying the body of law surrounding "private searches" to the facts of the case. While one may verbalize or signal his or her consent to a search, such is not the situation with the legal concept of the private-versus-Government nature of the search questioned in this case, which calls for a conclusion of law, based on an analysis of the facts of the case. After doing an appropriate *de novo* review, I believe ETSA Voitlein was acting as an agent of the Government, in a quest for evidence, when he seized the questioned vial from an area in which it is agreed the appellant had a reasonable expectation of privacy at the time of the search and seizure.

### Facts

The basic, relevant facts of this case are not in dispute. ETSA Voitlein, a young Sailor with 7 months of service in the Navy, knowing the extreme seriousness of an illicit drug being in his barracks room, was confronted with that situation, when one of his roommates—the appellant—announced that he had an illegal drug in a container. The appellant openly displayed the container to his two roommates and then secreted it in a drawer only a few feet away from ETSA Voitlein.[8] After trying but not succeeding in

---

6. A Seaman Apprentice is an E–2; a Chief is an E–7. The "(SS)" after Chief Wilt's rate and rating designation indicates that he is "qualified in submarines." *See* Naval Military Personnel Manual, Art. 1220–040. "Rating" is a term used in the Navy to identify an occupational specialty, while "rate" indicates one's pay grade.

7. "Consent 'is a factual determination. . . .' " *United States v. Vassar,* 52 M.J. 9, 12 (1999)(quoting *United States v. Radvansky,* 45 M.J. 226, 229 (1996)). *See Reister,* 44 M.J. at 413–14; *United States v. Kitts,* 43 M.J. 23, 28 (1995); *United States v. Kosek,* 41 M.J. 60, 64 (C.M.A.1994).

8. ETSA Voitlein could hardly avoid being cognizant of the appellant's activities in their shared

ignoring the appellant's actions with the proclaimed illegal substance, ETSA Voitlein spent a sleepless night worrying about the situation.

The next morning—after passing on the opportunity to "privately" remove the questioned container from the room and turn it in—ETSA Voitlein reported the situation, as required by Navy Regulations, to ETC(SS) Wilt, the Chief Petty Officer in his direct chain of command.[9] Chief Wilt, with 10 to 15 years of service in the Navy, and knowing his duty and responsibility regarding controlled substances (*see* U.S. Navy Regulations, Article 1138 (1990)),[10] made a hasty, "gut"-reaction decision to disregard the potential validity of ETSA Voitlein's report, by sending him—a direction ETSA Voitlein interpreted to be an order—back to the room to retrieve the vial with whatever substance it might contain. Record at 54–57 (ETSA Collinge's testimony), 60–61, 67–68, 71 (ETSA Voitlein's testimony), 79–82 (ETC(SS) Wilt's testimony).

### "Private" versus Government-sanctioned Searches

In the prominent "private search" cases, including those cited in the majority opinion, an individual, acting on his or her own initiative, seizes or otherwise obtains evidence, which he or she subsequently turns over to the Government. In those cases, the courts have held that the individuals were acting in a private capacity and not as agents of the Government, in that Government officials had no contemporaneous knowledge of the questioned search. *See United States v. Ja-*

*cobsen*, 466 U.S. 109, 113–14, 117, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Illinois v. Andreas*, 463 U.S. 765, 769, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983); *Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *see also Walter*, 447 U.S at 662, 100 S.Ct. 2395 (Blackmun, J., dissenting); *Coolidge v. New Hampshire*, 403 U.S. 443, 487–90, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *Reister*, 44 M.J. at 416; *see also Reister*, 44 M.J. at 416 (Everett, Sr.J., concurring); *Sullivan*, 42 M.J. at 362; *United States v. Jacobs*, 31 M.J. 138, 141–43 (C.M.A.1990); *United States v. Baker*, 30 M.J. 262, 266–67 (C.M.A. 1990); *United States v. Portt*, 21 M.J. 333, 334 (C.M.A.1986); *United States v. Volante*, 4 C.M.A. 689, 691–93, 16 C.M.R. 263, 265–67, 1954 WL 2451 (1954); *United States v. Bruci*, 52 M.J. 750, 753–54 (N.M.Ct.Crim.App. 2000); *United States v. Faucett*, 50 C.M.R. 894, 896, 1975 WL 15779 (A.F.C.M.R.1975).

Such is not the situation in this case. ETSA Voitlein was not acting in a private capacity when he seized the appellant's vial containing cocaine. ETSA Voitlein *could* have so acted, as he had the opportunity to do so *before* going to talk to Chief Wilt to seek guidance and direction. ETSA Voitlein, however, chose not to remove the vial from the appellant's nightstand before seeking out Chief Wilt. The record of trial clearly establishes that ETSA Voitlein genuinely was concerned about the presence in their barracks room of what the appellant had declared to be an illicit drug. At first he tried to ignore it, but the thought of it kept him from sleep-

barracks room. Their racks were perpendicular to one another, with the nightstand where the appellant placed the vial containing the questioned substance being between the two racks. The head of each of the racks was closest to the nightstand. Record at 45.

9. U.S. Navy Regulations, Art. 1137 (1990) states: Persons in the naval service shall report as soon as possible to superior authority all offenses under the Uniform Code of Military Justice which come under their observation, except when such persons are themselves already criminally involved in such offenses at the time such offenses first come under their observation.

10. U.S. Navy Regulations, Art. 1138 (1990) states: 1. All personnel shall endeavor to prevent and eliminate the unauthorized use of marijuana

and other controlled substances within the naval service. 2. The wrongful possession, use, introduction, manufacture, distribution and possession, manufacture, or introduction with intent to distribute, of a controlled substance by persons in the naval service are offenses under Article 112a, Uniform Code of Military Justice. Except for authorized medicinal or other authorized purposes, the possession, use, introduction, sale or transfer of marijuana, narcotics, or other controlled substances on board any ship or craft, aircraft of the Department of the Navy or within any base, naval station, or other place under the jurisdiction of the Department of the Navy by all persons is prohibited. . . .

ing well, if at all, that night. Choosing not to tell the two room inspectors the next morning, because he did not know them, as soon as the inspection was over, ETSA Voitlein sought out Chief Wilt, who was in ETSA Voitlein's direct chain of command. ETSA Voitlein told Chief Wilt his suspicions about the appellant having an illicit substance in their barracks room, based on what he had observed and what the appellant had said about the contents of the container the previous evening. *Only after* being directed to retrieve the questioned item from the room, direction that he took to be an order from one senior in his chain of command, did ETSA Voitlein return to the room and seize the vial, the contents of which was established to be cocaine. Record at 45, 49, 60–61, 64–67, 70–71, and 129.

While the *corpus* of the military judge's legal analysis of the issue was ETSA Voitlein's motivation, which he concluded was of a non-Fourth Amendment-implicating private nature, the majority opinion herein states:

> However, we find Chief Wilt's knowledge and motivation equally, if not more, important. Indeed, the determining factor in whether or not the cocaine seizure was constitutional is what motivated Chief Wilt's directions to ETSA Voitlein. Were his directions part of a "search" in a "quest" for incriminating evidence? *See generally Dow Chemical Co. v. United States*, 476 U.S. 227, 230, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). If so, we would find that Chief Wilt's statement, "Go and get it," would have made ETSA Voitlein his agent in such a quest. Under the unique circumstances of this case, however, we find that Chief Wilt was simply not engaged in a quest for evidence of a crime. While his "agent" may have been so engaged on his own motivation, we find that Chief Wilt, as the key governmental actor, was not.

I certainly agree that as a Chief Petty Officer (E–7) in the United States Navy, Chief Wilt was the "key governmental actor" in this case, and as a Chief Petty Officer, he is presumed to act with the color of Government authority in carrying out his official

duties. By United States Navy Regulations, as well as time-honored tradition, Chief Wilt is charged with the general duty to ensure the maintenance of good order and discipline within the Naval Service, and he had a specific responsibility within the Naval Submarine School, where he was assigned as the Military Training Instructor Leading Chief and, as such, was in the direct chain of command of both the appellant and ETSA Voitlein, a situation that certainly creates a strong inference of Government action in the circumstances of this case.

In *United States v. Loukas,* our senior Court restated the point that the Court "has implicitly held that a superior in the immediate chain of command of the suspect subordinate will normally be presumed to be acting in a command disciplinary function." 29 M.J. 385, 389 n. * (C.M.A.1990). While the declaration was made in the context of the requirement for rights advisement prior to questioning, I believe the underlying rationale for the declaration is applicable to the situation in this case. Chief Wilt was acting in an official capacity and, likewise, ETSA Voitlein was carrying out an official function when he retrieved the vial at the specific direction of Chief Wilt. The majority opinion, nonetheless, concludes that, since Chief Wilt personally believed the allegation was "totally unfounded," his directions to ETSA Voitlein did not make ETSA Voitlein a Government agent on a quest for incriminating evidence. Thus, the linchpin of the majority opinion is Chief Wilt's motivation at the time he told ETSA Voitlein to retrieve the vial.

### Motivation as a Factor

While relevant motivation is the keystone to some of the most seminal private-search cases, in those instances the outcome-determinative motivation has been that of the individual who actually took the action later judicially identified to have been a "private search" without Fourth Amendment implications. *See Coolidge,* 403 U.S. at 448–49, 91 S.Ct. 2022; *Reister,* 44 M.J. at 416; *Portt,* 21 M.J. at 334; *Volante,* 4 C.M.A. at 690–93, 16 C.M.R. at 264–67; *Bruci,* 52 M.J. at 754. Such is not the fact pattern in this case.[11]

**11.** While the fact pattern in *Volante* is somewhat

close to that in this case, the analogy breaks

A better analogy to consider the pivotal role of Chief Wilt's motivation in this case can be developed from a comparison of this case to several of the significant sans-rights-warning-incriminating-statement cases, such as *Norris, Loukas,* and *Duga,* where the motivation of the questioner is the decision-determinative factor.[12] In each of these cases, however, the primary and controlling motivation on the part of the questioner is clearly established, respectively, as either a personal concern about a family member, an aviation safety issue, or a friend's curiosity.[13]

In this case, while Chief Wilt might have thought the appellant's actions the previous evening were a matter of the appellant just playing around, certainly ETSA Voitlein—the one who actually seized the drug that was the I-beam of the Government's prosecution of the appellant—was sincere in his belief that it was no joke. In addressing ETSA Voitlein's "private" motivation, the majority opinion states:

> Moreover, we find that when ETSA Voitlein actually seized the incriminating evidence, he was doing so out of a "private motivation" to protect his "own personal interests." Among other things, including his desire to get the illegal drugs out of his room and thus insulate himself from possible criminal liability, ETSA Voitlein wanted to prove himself correct with respect to his representations to Chief Wilt.

Clearly one may infer ETSA Voitlein's actions, in part, were motivated by a desire to ensure he was not wrongly caught up in the appellant's personal possession of an illegal substance in their shared barracks room. However, I am not sure how that serves to support a search-motivated-by-private-interests conclusion. ETSA Voitlein could have acted on his own, seized the vial, and brought it directly to Chief Wilt; thus saving all parties, including the apparently very busy Chief Wilt, a lot of time. Yet, it is precisely because of his desire to "insulate himself

from possible criminal liability" that he did not act on his own, but rather he went to talk to Chief Wilt, before seizing the vial of cocaine at Chief Wilt's specific direction. *Id.* Due to the obvious potential legal-liability dangers inherent in any self-help (personal) effort, ETSA Voitlein consciously and actively sought out Government-sponsorship and direction for the drug decontamination of his barracks room. It may be inferred that he did not want to walk around on his own call carrying a vial containing an illegal substance, running the risk of not being believed when he tried to explain the circumstances to his chain of command.

However, given the obvious personal element, ETSA Voitlein's desire and efforts to act in accordance with the Navy's policy concerning illegal substances should neither be overlooked nor discounted as a motivational factor. When asked during his trial testimony about his knowledge of an individual service member's duty to help prevent drug abuse, he answered he believed that it was "[t]o go to someone in your chain of command and tell them." Record at 69. Finally, I see neither value added by, nor any support in the Record for, the majority's assertion that part of ETSA Voitlein's motivation in seizing the appellant's vial of cocaine was that he "wanted to prove himself correct with respect to his representations to Chief Wilt."

### "Silver Platter" Doctrine Analogy

Perhaps an even more useful analogy for the motivational approach in examining the case-crucial private-versus-Government-search issue in this case may be to consider the analytical concepts developed in connection with the now-antiquated "silver platter" doctrine. Although the doctrine is no longer a viable evidence-introducing vehicle, the analysis developed to determine whether Federal officials had participated in a state search sufficiently to prevent the introduction of improperly-seized evidence in Federal court is helpful in this case, in deciding

---

down, because that Court was not able to determine from the testimony in the Record the exact import of the guidance given by the senior to the junior, when the junior informed the senior of suspicions concerning the accused. *See Volante,* 4 C.M.A. at 690–91, 16 C.M.R. at 264–65.

12. *United States v. Norris,* 55 M.J. 209 (2001); *Loukas,* 29 M.J. at 389; *United States v. Duga,* 10 M.J. 206 (C.M.A.1981).

13. *Norris,* 55 M.J. at 214–15; *Loukas,* 29 M.J. at 389; *Duga,* 10 M.J. at 208.

whether Chief Wilt's participation in ETSA Voitlein's seizure of the vial was sufficient to metamorphose the search from a "private" one to a Government-sponsored quest for incriminating evidence.[14]

The Supreme Court, in *Byars v. United States*, provided a caution in examining "silver platter" cases:

> While it is true that the *mere* participation in a state search of one who is a federal officer does not render it a federal undertaking, the court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods.

273 U.S. at 32, 47 S.Ct. 248. And in *Lustig v. United States*, the Court provided the key to its analysis of the "silver platter" cases, which we can analogize to this case:

> The decisive factor in determining the applicability of the *Byars* case is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means.

338 U.S. at 79, 69 S.Ct. 1372.

Making the analogy to the concept of private searches, and after applying these "silver-plate" doctrine standards to the facts of this case, the conclusion is, that while I believe the actions and motivations of Chief Wilt were as he stated in his testimony and not a subterfuge for any type of improper Government action to secure incriminating evidence against the appellant, "the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means" was paramount and controlling in the seizure of the most critical, case-outcome-determinative evidence against the appellant in this case—the cocaine itself. *Id.* Accordingly, I believe it

reaches the level of a Fourth Amendment transgression.

I base this conclusion on the fact that ETSA Voitlein could have seized the vial on his own accord, but did not. As required by service regulations, as discussed above, he reported the information concerning the illegal substance to the Chief Petty Officer in his direct chain of command. *Only after* being directed, or—from his perspective, ordered—by Chief Wilt to go and retrieve the vial did ETSA Voitlein return to the barracks room and seize the vial of cocaine. Thus, from the facts established in the Record, but for Chief Wilt's direction to ETSA Voitlein to go and retrieve the questioned vial, the seizure might not have occurred.

It is beyond the scope of this Court's consideration to speculate either as to what ETSA Voitlein might have done if Chief Wilt had not told him to go get the questioned vial, or as to what higher authority or law-enforcement personnel may have done if Chief Wilt had taken ETSA Voitlein and his information to one of those entities.[15] As the Supreme Court stated in *United States v. Jacobsen:*

> Such a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered.... The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred.

466 U.S. at 114–15, 104 S.Ct. 1652.

### Agency Theory

*Qui mandat ipse fecisse videtur.*

A person who commands (a thing to be done) is considered to have done it him-

---

**14.** The "silver platter" doctrine permitted the introduction in Federal courts of legally-tainted evidence seized by state officials, as long as Federal officials had not participated in the search to the extent it became a joint search, and the search and seizure by state officials, in fact, was not merely a subterfuge for improper Federal action. The doctrine was overturned by *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). For discussions of the "silver platter" analysis, *see Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819

(1949); *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927). *See also* Paul G. Reiter, *Admissibility, in Criminal Case, of Evidence Obtained by Search by Private Individual*, 36 A.L.R.3d 553, 559, 590, n. 10 (1971).

**15.** "For all sad words of tongue and pen, the saddest are these: 'It might have been.'" John Greenleaf Whittier, "Maud Muller," 1854, as quoted in RAYMOND V. HAND, JR., THE GIANT BOOK OF AMERICAN QUOTATIONS 525 at 213:20 (1990 ed.).

self.[16]

The majority opinion is based on the premise that, since Chief Wilt did not actually believe the appellant had an illegal substance in the barracks when he directed ETSA Voitlein to go and get the substance, nothing ETSA Voitlein, as Chief Wilt's "agent," believed, said, or did could transform the seizure into a quest for incriminating evidence by a Government agent. The majority opinion seems to be attempting to turn the basic principles of "agency" on its head. In *Reister*, 44 M.J. at 415, our senior Court adopted the agency test used by the Supreme Court in *Coolidge*, 403 U.S. at 487, 91 S.Ct. 2022, when that Court articulated the test as "whether Mrs. Coolidge, in light of all the circumstances of the case must be regarded as having acted as an 'instrument' or agent of the state when she produced her husband's belongings."

Clearly in this case, ETSA Voitlein was the agent, the direct instrument, of Chief Wilt's bidding, doing exactly what the Chief had directed him to do. Considering the agency concept, this is not even a close case, where the Government is being held accountable for the consequences of its agent's unforeseen actions, because those actions were found to have been at least remotely motivated by a purpose to serve the interests of the Government. Rather, to borrow from another Supreme Court decision, vicarious liability should be imposed "on the ground that the [S]ailor's conduct 'was not so "unforeseeable" as to make it unfair to charge the Government with responsibility.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 795, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)(quoting *Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167, 171 (2nd Cir.1968)).[17] Bottom line: (a) In seizing—without appropriate command authority—the cocaine from an area in which the appellant enjoyed a legitimate expectation of privacy, ETSA Voitlein did *exactly* what Chief Wilt directed (*ordered*) him to do; and (b) The Government is accountable for that conduct, regardless of what Chief Wilt

personally and privately did or did not believe.

Assuming *arguendo* that the motivation/actual beliefs of Chief Wilt determine the outcome of the search and seizure issue in this case, his beliefs would have to be *both* honest and reasonable. While I agree with the majority opinion that Chief Wilt *honestly* did not believe ETSA Voitlein to be correct in his allegations against the appellant, I do not agree, from either a traditions-of-the-Navy or a legal-analysis perspective, that Chief Wilt was "reasonable" in either his disbelief, or in his resulting somewhat legally-irresponsible actions. I believe that, based on his position of authority and responsibility both within the Navy and, specifically, at the Naval Submarine School, Chief Wilt had a duty to handle the situation with proper legal protocol, with which he indicated he was familiar, when he testified: "[I]f there's ever an accusation or there's ever any sort of nod toward possibly being drugs I should probably, okay, stop, all stop, call legal. . . . That's my understanding of the procedure if we stumble upon drugs or anything . . . contact legal." Record at 87.

Additionally, an inference can be drawn from Chief Wilt's testimony that at the time he did have some legal knowledge or training, and, at least fleetingly so, he did think about the legal ramifications of the situation. Before directing ETSA Voitlein to go and retrieve the questioned vial, Chief Wilt asked him if the vial was in a drawer within the appellant's wall locker, or was "out in one of the common area drawers of the room." Record at 80. When ETSA Voitlein told him it was not in the appellant's wall locker, Chief Wilt then directed him to go get it. *Id.* Thus, it appears Chief Wilt knew something about the importance of the legal distinction between an item being in one's wall locker, with a generally-accepted expectation of privacy in that area, and items located in a "common area," where, commonly, an individual does not enjoy such an expectation.

---

**16.** BLACK'S LAW DICTIONARY 1681 (7th ed.1999).

**17.** *Faragher* brought suit under the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e *et seq.*, for a sexually hostile work environment created by the petitioner's supervisors.

As he testified, Chief Wilt knew the proper procedure to follow upon receiving an allegation of at least of some credibility, coming as it did from an eye witness, was to call Legal. He also seems to have indicated by his testimony that, perhaps, he had some knowledge of the "common-area" factor in a barracks search-and-seizure situation, although he was wrong in its application to the facts of this case. This is not to imply that Chief Wilt was being less-than-completely truthful in his testimony, but it does create an inference that Chief Wilt has, as any Chief Petty Officer in the Navy should, some background and familiarity with the procedurally-proper way to deal with situations such as the one that forms the basis of this case. While Chief Wilt may not have cognizably considered the legal implications of the circumstances at the time, it appears that he had some grasp of the legal concepts involved in this case.

If Chief Wilt actually gave any thought to the legal ramifications of directing ETSA Voitlein to retrieve the vial, he chose to ignore them, because he just did not believe that the appellant had an illicit drug in the barracks room. I disagree with the majority opinion that Chief Wilt made a legally-reasonable decision. While, as Chief Wilt himself points out, he had no formal law-enforcement training, I place little weight on that fact. Record at 74. As an E–7 and in the position of responsibility he held, I believe an inference can (and *should*) be made that Chief Wilt knew or is accountable for knowing how to correctly handle the factual situation presented to him in this case. Quite simply, Chief Wilt was busy. He neither took the time to conduct a proper inquiry himself, nor make the minimal effort to get ETSA Voitlein to someone with law enforcement or legal knowledge or responsibilities.[18] Chief Wilt quickly concluded that the appellant must have been playing a joke on ETSA Voitlein and did not, in fact, have an illicit drug in their room. He based this conclusion on his past history with the appellant and his belief that the appellant did not have the "guts" to do such a thing, as he considered the appellant "sort of weak." Record at 82; *see also* Record at 80–82, 86.

The majority opinion analyzes *why* Chief Wilt did not believe that the appellant had an illegal substance in the barracks room as ETSA Voitlein reported. However, I believe that is extraneous to our consideration of this case, in that in his testimony, Chief Wilt indicated that at the time he did not think through why he did not believe ETSA Voitlein's allegation. When asked if his many years of experience in the Navy in dealing with Sailors disgruntled with a roommate was one of the things that prompted him not to believe ETSA Voitlein's story, Chief Wilt responded: "You know at the time, sir, I really—the thought process of why I didn't believe it, I wasn't really analyzing why I didn't believe it at the time but I guess in retrospect...." Record at 91.

I understand one might argue that these factors are important to consider, because, although Chief Wilt did not consciously consider them before he made his snap call, they were part of the cognitive process by which he formed his overall opinion of the appellant. And it was his overall opinion of the appellant upon which he based his almost-instantly-reached conclusion that the appellant would not actually bring an illegal drug into the barracks. My point is that—regardless of what other relevant facts they might know—we limit our review of a magistrate's probable-cause determination to the information the seekers of the search warrant *actually* related to the magistrate.[19] Likewise, I believe, since Chief Wilt, by his actions, made himself the pseudo/virtual "magistrate" in

---

18. From Chief Wilt's testimony, it appears that both the Command Duty Officer and the Officer of the Day physically were located very close to him in the same building, and one wonders how far away the Legal Office could be in what size-wise is a relatively small command? *See* Record at 88–89.

19. *See Whiteley v. Warden,* 401 U.S. 560, 565, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). "Under the cases of this Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate. A contrary rule would, of course, render the warrant requirement of the Fourth Amendment meaningless." *Id.* at 565 n. 8, 91 S.Ct. 1031; *see also* 2 LaFave, Search and Seizure § 4.3(a) at 458–59.

this case, we are so limited in our review of the decision he made to the things that he actually "articulated" in his own mind, before reaching his conclusion on the merits of ETSA Voitlein's accusation. If we do so, what we are left with as Chief Wilt's conscious basis for not believing ETSA Voitlein's timely, eye-witness-based assertions is: Chief Wilt believed the appellant was somewhat "weak" and did not have the "guts" to possess an illegal substance in his barracks room.[20] Interestingly, if one carries through with the analogy that Chief Wilt made himself the functional equivalent of a magistrate in the real-time adjudication of the search issue, the conclusion is that while he found *no* probable cause, nevertheless, by directing ETSA Voitlein to go and retrieve the vial, he "authorized" the search anyway!

In its analysis of the case-outcome-determinative issue of whether the seizure of the vial of cocaine by ETSA Voitlein was a "private search," the majority opinion quotes the Supreme Court's decision in *United States v. Jacobsen,* in which the Court stated:

> This Court has also consistently construed [the Fourth Amendment] protection as proscribing only governmental action; it is wholly inapplicable "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *Walter v. United States,* 447 U.S. 649, 662, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980)(Blackmun, J., dissenting).

466 U.S. at 113–14, 104 S.Ct. 1652. As discussed above, ETSA Voitlein was "acting as an agent of the Government," with the specific direction and "knowledge of [a] governmental official," Chief Wilt. *Id.*

---

**20.** I do not associate the illegal possession of a controlled substance in a military barracks as a corollary of being a "strong" person, and I hope the judgment as to whether or not one has "guts," or, perhaps more correctly, "intestinal fortitude" or "courage"—normally a good thing—is not commonly seen as a valid measuring criteria to assist those in leadership positions in evaluating the likelihood of a Sailor or Marine being in the wrongful possession of an illegal substance—*always* a bad thing.

**Fourth Amendment Rights**

In its 1914 decision in *Weeks v. United States,* the Supreme Court stated:

> The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law. *This protection reaches all alike, whether accused or a crime or not,* and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws . . . .
>
> . . . The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which has resulted in their embodiment in the fundamental law of the land.

232 U.S. 383, 391–93, 34 S.Ct. 341, 58 L.Ed. 652 (1914)(emphasis added).[21]

The appellant is no less entitled to the citizen protections established in the Constitution than any other U.S. citizen, based either on his military status or the fact that he, in fact, committed criminal misconduct. It is well-recognized judicially that " '[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian,' *Orloff v. Willoughby,* 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953), and that 'the rights of men [and women] in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty . . . .' *Burns v. Wilson,* 346 U.S.

---

**21.** "Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom. That safeguard has been declared to be 'as of the very essence of constitutional liberty' the guaranty of which 'is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen . . . .' *Gouled v. United States,* 255 U.S. 298, 304, 41 S.Ct. 261, 65 L.Ed. 647 (1921); *cf. Powell v. Alabama,* 287 U.S. 45, 65–68, 53 S.Ct. 55, 77 L.Ed. 158 (1932)." *Ker,* 374 U.S. at 32–33, 83 S.Ct. 1623.

137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953)(plurality opinion)." *Parker v. Levy,* 417 U.S. 733, 744, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).[22] The proper balance between the "essential needs of the armed services" and the basic citizen rights of its members must always be sought to be struck. *United States v. Priest,* 21 C.M.A. 564, 570, 45 C.M.R. 338, 344, 1972 WL 14190 (C.M.A. 1972).

No compelling circumstances exist in this case that call for or justify a perversion of proper procedure to any degree in the name of military necessity. While his military status does not affect the appellant's Fourth Amendment rights in this case, it does affect how we should consider the conduct of Chief Wilt and his position, authority, and responsibilities in the *command's hierarchical structure of discipline.* This case thus highlights the events-shaping effects within the military structure dictated by the " 'overriding demands of discipline and duty.' " *Burns v. Wilson,* 346 U.S. at 140, 73 S.Ct. 1045. As the Supreme Court concluded in *Chappell v. Wallace,* 462 U.S. 296, 300, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983):

> This becomes imperative in combat, but conduct in combat inevitably reflects the training that precedes combat; for that reason, centuries of experience have developed a hierarchical structure of discipline and obedience to command, unique in its application to the military establishment and wholly different from civilian patterns.

As discussed below, Chief Wilt is part of the command's "hierarchical structure of discipline," with all that status inherently implies. *Id.*

### "Ask the Chief"—Role of the Chief Petty Officer

While Chief Wilt indicated he has never received any formal law enforcement train-

ing, I do not give much weight to that fact. Record at 74. Chief Wilt is not merely an E–7 in the rank hierarchy; he is a Chief Petty Officer in the United States Navy, within which the phrase "Ask the Chief" is one of the Naval Service's cardinal tenets.

In the United States Navy, the title "Chief Petty Officer" carries with it responsibilities and privileges no other armed force in the world grants enlisted people. These responsibilities and privileges exist because for 100 years, Chiefs have routinely sought out greater challenges and assumed more responsibility.

A message from Chief of Naval Operations Admiral Frank B. Kelso II on the 100th anniversary of the creation of the rank of Chief Petty Officer, 1 April 1993.[23]

The United States Navy Chief Petty Officer Creed states: "In the United States Navy—and only in the United States Navy— the rank of E7 carries with it unique responsibilities and privileges you are now bound to observe and expected to fulfill." [24] And the 1918 Bluejackets Manual (Part IV) [25] contains the following:

> Along with all these changes [—uniform, quarters, method of living and treatment from senior officers—] comes a very great change in responsibilities as well as the absolute necessity for a different point of view. If you forget the changes of this nature, you altogether fail in your duties to the Government.

> The position of chief petty officer is one of special honor. It shows not only that you have served successfully, but that your service has met with the commendation of your seniors, that you are proficient, trustworthy and reliable. . . .

> . . . The fact that you are a chief petty officer is evidence that you know how

---

**22.** *See also Solorio v. United States,* 483 U.S. 435, 440, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987); *In re Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890).

**23.** Found at http://www.history.Navy.mil/faqs/faq46–3.htm.

**24.** Found at http://goatlocker.exis.net/creed 1.htm.

**25.** Celebrating 100 years as the U.S. Navy Sailor's basic guide to seamanship and naval heritage, *The Bluejacket's Manual* is now in its 23rd edition. *See "The Bluejacket's Manual* Turns

things should be done. Do not neglect to do your duty properly.... The tone of the ship, the tone of the service itself must come more directly from the chief petty officers than from any other group of people in the Navy....

... Yours is a position of honor and responsibility. Do your work from a sense of duty. Be thorough in all you do and require of your subordinates thoroughness and military exactitude.[26]

Point being: Chief Wilt is a part of the command's "hierarchical structure of discipline." *Id.* A Chief Petty Officer's position, responsibilities, and authority is such within a command's leadership structure, that he or she is part of that select group that would be included in the net cast by our senior Court when it stated: "This Court has implicitly held that a superior in the immediate chain of command of the suspect subordinate will normally be presumed to be acting in a command function." *Loukas,* 29 M.J. at 389 n. *.

While not equating Chief Wilt's actions with being part of the law enforcement arm of the command, the majority opinion does identify him as "the key governmental actor." If one, however, does believe Chief Wilt's actions in this case are part of the command's disciplinary arm, it would cast a significantly different light on the way the case is decided. As the Court of Military Appeals indicated in *United States v. Volante*: "In the military establishment, law enforcement is frequently an integral part of the broader problem of command." 4 C.M.A. at 692, 16 C.M.R. at 266. For all the reasons discussed above, I believe Chief Wilt is (and was the day in question)—by rank and position definition—a viable part of the command's disciplinary arm, and, thus, his actions, or lack thereof, should be scrutinized accordingly.[27]

Concomitant with such events-sculpturing authority comes accountability. As the Supreme Court concluded in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 392, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971):

An agent acting—albeit unconstitutionally—in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own.

While I do not believe that Chief Wilt had any improper motives in the way he handled the situation that confronted and tested his leadership skills in this case, for all the reasons discussed above, I believe Chief Wilt—and, consequentially, the Government—should be held accountable for his actions.

At the time the events central to this case occurred, Chief Wilt was directly responsible for 240 young, relatively-new-to-the-Navy Sailors, who were students at the Naval Submarine School. Record at 76. The Naval Service is a part of our society where general-military or mission-specific necessity sometimes requires modification or the limitation of a Sailor's or a Marine's Constitutional rights, as a price to pay for the privilege of serving one's Country. Those who claim such military necessity or who violate a service member's rights without other just cause should be held to a high standard.

In doing that we attempt to balance and weigh the relevant interests of all concerned. On one side of the scale in this case, we have the Fourth Amendment rights of the appellant. On the other side are: the actions of ETSA Voitlein, who properly reports to the Chief Petty Officer in his chain of command

100," at http://www.news.Navy.mil/media/allhands/flash/AH200206/feature2.html.

**26.** Found at http://goatlocker.exis.net/1918.htm.

**27.** *See* HOMER E. MOYER, JR., JUSTICE AND THE MILITARY 249–51 (1972). "Two classes of military personnel have been held to be officials or agents 'acting in a Government capacity.' ... These are .(1) persons specifically assigned to law enforcement duty and (2) persons having direct disciplinary power over the accused. As law enforcement officials are readily identifiable, there has been little conceptual difficulty in applying search and seizure law to them. Applying the criterion of direct disciplinary power, however, has been more troublesome. It is complicated by the military rank structure since all commissioned and noncommissioned officers [NCO] have responsibility, at least in theory, for the maintenance of discipline." *Id.* at 250–51. While, generally speaking, I believe a very strong argument can be made that such duties and responsibilities are concomitant with the authority inherent in being a Navy Petty Officer or a Marine Corps NCO (i.e., an E–4 or above), the Chief Petty Officer certainly is a clear and appropriate demarcation line.

his eye-witness account of the appellant's public secretion of an announced illegal substance in their barracks room the previous evening; the gut-reaction of Chief Wilt, who knew the proper legal procedure to follow upon receiving such an allegation, but who almost instantly concludes the allegation is without any merit, because, in his estimation, the appellant was "weak," without the "guts" to do such a thing as have an illegal drug in the barracks; and Chief Wilt's direction to ETSA Voitlein just to go get the substance, when Chief Wilt could have just as easily told him to secure the room, until the master-at-arms arrived to take control of the situation.[28]

### Exclusionary Rule

A separate, but equally important, issue is whether the physical evidence in this case should have been excluded from consideration at the appellant's court-martial. In *Illinois v. Gates*, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983),[29] the Supreme Court stated:

> The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by the police conduct.

The Supreme Court has restricted application of the exclusionary rule " 'to those areas where its remedial objectives are most efficaciously served.' " *United States v. Payner*, 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980)(quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)).

### Application of the Exclusionary Rule

The fact that Chief Wilt and ETSA Voitlein seem to have acted in "good faith" is commendable, but not controlling. In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court put it in this perspective:

> " '[G]ood faith on the part of the arresting officer is not enough.' *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 [ (1959) ]. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police. *Id.* at 97, 85 S.Ct., at 228."

*Id.* at 915 n. 13, 104 S.Ct. 3405.

There is a tendency to view any relief to the appellant in this case as a windfall to one who well-deserves the criminal conviction and punishment adjudged at trial. Applying the exclusionary rule in this case, however, will efficaciously serve its remedial objectives and not just merely set a guilty man free. Consider the following thoughts from cases where the Supreme Court and our own senior Court have wrestled with this difficult issue:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 228–29, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)(quoting *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886)); *see also Coolidge*, 403 U.S. at 454, 91 S.Ct. 2022.

---

28. After the fact, officers from the Submarine Base Security Office used a military working (drug) dog to assist them in an after-the-fact proper search of the barracks room. Record at 95. Had this procedure been done originally, we would not now be "debating" this issue.

29. *See also Arizona v. Evans*, 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).

In *Coolidge*, the Supreme Court quoted its prior decision in *Elkins*, in stating: "The exclusionary rules were fashioned 'to prevent, not to repair,' and their target is official misconduct. They are 'to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.'" The Court went on in *Coolidge* to add: "But it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Coolidge*, 403 U.S. at 488, 91 S.Ct. 2022.[30]

As discussed below, I do not believe that the application of the exclusionary rule in this case will discourage anyone from doing his or her duty in regards to the maintenance of good order and discipline. In *Calandra*, 414 U.S. at 348, 94 S.Ct. 613, the Supreme Court concluded: "This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search." Such is the circumstance in this case.

Finally, our senior Court in *United States v. Khamsouk*, 57 M.J. 282, 292 (2002) stated:

Thus, in determining whether invocation of the [exclusionary] rule is warranted, the [Supreme] Court insists that lower courts strike a balance between "the public interest in determination of truth at trial" and the "incremental contribution that might [be] made to the protection of Fourth Amendment values...." *Stone* [*v. Powell*], 428 U.S. [465] at 488, 96 S.Ct. 3037, 49 L.Ed.2d 1067 [(1976)].

While this dissent is in no way intended to imply any malicious or otherwise improper motives on the part of Chief Wilt, one can easily see the potential for abuse of which our senior Court and the Supreme Court speak in the decisions cited. The Constitutional rights of a service member are far too important, not to have official actions that directly and adversely impact on them thought through thoroughly, with some degree of reasonable care and with the minimal effort most often sufficient to follow the correct, legal, and established procedures.

## Conclusion

For all the reasons stated and discussed above, I believe the finding of a Fourth Amendment violation, by holding the Government accountable for the actions of Chief Wilt—via his "agent," ETSA Voitlein—and the application of the exclusionary rule to the evidence seized in this case, will efficaciously serve the remedial objectives of the rule. It should in no way discourage individual Sailors and Marines from continuing to do their duty in taking appropriate reporting action, regarding criminal misconduct of which they may become aware. This dissent does not question the propriety of the actions of ETSA Voitlein. I also believe that the course of action recommended by this dissent makes a positive, not a negative, statement about the critical and events-altering authority and responsibility incumbent on the command positions inherently held by Chief Petty Officers and above. It fortifies, not denigrates, that status and authority. Hopefully, it will encourage all those in a position of such authority to give proper and due consideration to information such as that provided by ETSA Voitlein to Chief Wilt, and it will foster appropriate action to balance the rights of the individual Sailor and Marine with military necessity.

Given the circumstance that he actually did the crime as charged and convicted (and, thus, is "morally guilty"), the appellant may not "deserve" relief in this case, but such is demanded as his birthright as an American citizen, because, in my opinion, he was not convicted in accordance with the rules and procedures that must be honored before one may be found "legally" guilty. To overturn the appellant's conviction would not be a travesty; it would be a positive statement for the military justice system.

Reversing the findings of a trial judge, as discussed above, is not something to be done in a cavalier manner by appellate judges sitting in Washington, D.C., so far removed in time and place from real-time Fleet opera-

---

**30.** *See also Calandra,* 414 U.S. at 347–48, 94 S.Ct. 613.

tions. As it should be, the standards to be met in order to do so are high. Our senior Court provided us with a vivid sensory perception to apply to the reversal standard, when it stated: "[I]t must be 'more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *United States v. French*, 38 M.J. 420, 425 (C.M.A.1993)(quoting *Parts and Electric Motors Inc. v. Sterling Electric, Inc.*, 866 F.2d 228, 233 (7th Cir.1988)).

The smell in this case is not that of old, dead fish, but rather it is the scent of the thick, foggy mist of musket fire that more than two and a quarter centuries ago drifted over the fields at Lexington and Concord.

"When we assumed the Soldier, ...."